STATE of Wisconsin, Plaintiff-Respondent,

v.

Randall E. WOLVERTON, Defendant-Appellant.†

Supreme Court

*No. 93–3268–CR. Oral argument March 9, 1995.—Decided June 7, 1995.*

(On certification from the court of appeals.)

(Also reported in 533 N.W.2d 167.)

---

†Motion for reconsideration denied Sept. 19, 1995.

240

For the defendant-appellant there were briefs by *T. Christopher Kelly* and *Reynolds, Thomas & Kelly, S.C.,* Madison and oral argument by *T. Christopher Kelly.*

For the plaintiff-respondent the cause was argued by *James M. Freimuth,* assistant attorney general, with whom on the brief was *James E. Doyle, attorney general.*

STEINMETZ, J. This case presents five issues for review. The first issue is whether the defendant-appellant, Randall E. Wolverton, waived his right to postconviction appellate review of the denial of counsel at his preliminary hearing. Because Wolverton failed to file an appeal from the nonfinal order denying his motion to appoint counsel, as required by our decision in *State v. Webb,* 160 Wis. 2d 622, 631, 636, 457 N.W.2d 108, *reconsideration denied* 161 Wis. 2d 600, 468 N.W.2d 694 *(per curiam), cert. denied, Webb v. Wisconsin,* 502 U.S. 889 (1991), we hold that Wolverton waived his right to postconviction appellate review of the issue.

The second issue is whether Wolverton waived his right to postconviction appellate review of the trial court's exercise of discretion in terminating Wolver-

ton's cross-examination of the sole witness at his preliminary hearing. Because Wolverton again failed to comply with *Webb,* we hold that he waived his right to postconviction appellate review of the issue.

The third issue is whether the trial court committed reversible error when it denied Wolverton's motion to suppress identifications resulting from two pretrial showups, or when it refused to grant a continuance to enable his trial attorney to better prepare for the suppression motion. We hold that the showup identifications were admissible, and, therefore, the trial court did not commit reversible error.

The fourth issue is whether the trial court erred in allowing testimony by a police officer that a piece of metal found in Wolverton's wallet months after he was charged with burglary could have been used as a burglary tool. We hold that even if the testimony should have been excluded, its admission was harmless because no reasonable possibility exists that it could have affected the jury's verdict.

The fifth and final issue is whether sufficient evidence was presented at trial to sustain the verdict. We hold that sufficient evidence was presented to sustain the verdict.

A relatively detailed statement of the facts is necessary due to the variety of Wolverton's arguments on appeal. At approximately 8:00 p.m. on June 13, 1992, ten-year-old C.S. returned home from the playground across the street from her house. C.S. told her mother that a "strange man" at the playground scared her because he kept "staring" at her while talking to himself and walking back and forth approximately ten feet away from her. C.S. described the man as wearing a green shirt and jeans.

C.S. and her mother, Mrs. S., then looked out the window and saw the man walk up the neighbor's driveway and "jump into the air to look into a window" of the neighbor's house. The man then proceeded up and down two other driveways, following the same routine. The man eventually walked back to the playground. Mrs. S. called the police and reported the suspicious activity.

Shortly thereafter, Mr. S. returned home from work and commented to his wife about a suspicious man wandering around the neighborhood. Mrs. S. told her husband about C.S.'s encounter with the man and that she had called the police.

At 8:30 p.m., Officer James Papenfuss responded to the call made by Mrs. S. As the squad car approached, Mr. and Mrs. S. walked across the street and pointed out the man, who was standing approximately 75 yards away. Officer Papenfuss pursued and stopped the man, who identified himself as Randall Wolverton. Wolverton told Officer Papenfuss that he was visiting a friend in the area, had gone for a walk, and had become lost while looking for his car. Officer Papenfuss asked Wolverton the name of his friend and suggested that a telephone book might help locate the address. Wolverton replied that his friend's mother had remarried and that he did not know her name. Officer Papenfuss then drove Wolverton around the area in an effort to locate the car, but it was never located.

With Wolverton in the rear seat of the squad car, Officer Papenfuss returned to the home of Mr. and Mrs. S. From approximately ten feet away, Mr. S. positively identified Wolverton, who was still sitting in the squad car, as the man who was acting suspiciously. From inside the house, Mrs. S. could see that the man in the

244

squad car was the same man she had seen walking up and down her neighbors' driveways and looking into their houses. Officer Papenfuss warned Wolverton not to trespass on private property and then dropped him off near a public telephone.

That same day, Mr. and Mrs. R. had a picnic at their home, which is located approximately one block away from the home of Mr. and Mrs. S. At approximately 10:00 p.m., Mr. and Mrs. R. were standing in their front driveway and talking to some of their guests. Their nine-year-old daughter, M.R., went to the backyard to retrieve her shoes. There, she saw a man standing behind the chainlink fence that encompasses the backyard. According to M.R., the man, who "was zipping up his pants or something," asked M.R. if she "wanted some money or [to] make some money." M.R. became scared and ran across the yard to her ten-year-old friend. The man told M.R. to "come back." M.R. and her friend ran to the front driveway and told their parents about the stranger, prompting them to call the police.

Mr. R. and one of his guests, Mr. W., split up and immediately began to search for the stranger. Mr. W. saw a man, wearing jeans and no shirt, running across a nearby schoolyard. Mr. W. gave chase. The man stopped and pretended to be urinating in some bushes near a residence. When Mr. W. confronted the man, the man swore at him, falsely claimed to live at the residence, and then left through a backyard.

Moments later, Mr. R. saw a man emerge from between two houses. Mr. R. noted that the man was not wearing a shirt, but had a shirt tucked into his jeans. Mr. R. approached the man and asked him what he was doing. The man did not respond. Instead, he walked rapidly to a small red colored car, got in, and drove

245

away with the lights off. Mr. R. obtained the license plate number.

Responding to a report that a man had accosted a child, Officer Papenfuss proceeded to the home of Mr. and Mrs. R., where he talked with M.R. and her father. M.R. described the incident and told Officer Papenfuss that the man at the fence had black hair and was wearing jeans and a green shirt. Mr. R. explained that he had chased the man and obtained his license plate number. Officer Papenfuss performed a license check, which revealed that the vehicle belonged to Randall Wolverton.

A short time later, Officer John Graham spotted Wolverton approximately six blocks away from the home of Mr. and Mrs. R. Upon seeing Officer Graham's squad car, Wolverton made a motion as if pulling up the zipper on his pants. He then turned and started to walk away from the squad car. Officer Graham pursued Wolverton and stopped him. Officer Papenfuss joined them and arrested Wolverton for disorderly conduct. According to Officer Papenfuss, Wolverton was wearing the same clothes that he was wearing during their earlier encounter. Officer Papenfuss placed Wolverton in the rear seat of his squad car and drove him to the residence of Mr. and Mrs. R., where M.R., Mr. R., and Mr. W. each identified Wolverton, who was still sitting in the squad car, as the man they had encountered earlier in the evening.

Wolverton was subsequently booked into jail, approximately one-half mile away from the neighborhood in which he was arrested. At approximately 12:30 a.m. on June 14, 1992, Wolverton posted bond and was released on his own recognizance.

On the night of June 13, 1992, a sign in front of Mr. and Mrs. S.'s home stated that C.S. had just turned ten

years old. However, that night C.S. did not sleep in her own room, which is the only upstairs bedroom in the home. Frightened from her earlier encounter with the man at the playground, C.S. elected to sleep downstairs on the living room couch. Her older sister slept in the upstairs bedroom.

At approximately 2:00 a.m. on June 14, 1992, Mrs. S. was awakened by what she thought were footsteps coming down the stairs, causing her to believe that her older daughter came down to use the bathroom. However, when she checked the bathroom, she found no one there. Mrs. S. then went to the living room to check on C.S. She turned on a light and saw a man crouching down on his hands and knees a few feet away from where C.S. was sleeping. She hit the man on the back and asked him what he was doing in the house. She then yelled to her husband, "That guy is in our house!" C.S. awoke and saw the man run out the front door. C.S recognized the man by his attire as the same man who had scared her on the playground earlier that day. Mrs. S. called 911 to report the intruder.

When the police arrived, Mrs. S. described the intruder to the police. She told the police that she recognized the intruder by his green T-shirt, jeans, hair style, and build as being the same man who had scared C.S. earlier that night on the playground. The police examined the home but found no evidence of a forced entry. Both Mr. and Mrs. S. stated that although the wooden front door had been left open, the exterior screen door had been locked with a hook and eye latch. Mr. S. noted that the latch was loose. All other doors to the house were locked. The house was not ransacked, and nothing was missing.

The police subsequently arrested Wolverton and charged him with disorderly conduct under sec. 947.01,

Stats.,[1] criminal trespass to a dwelling under sec. 943.14,[2] and burglary under sec. 943.10(1)(a).[3]

Wolverton applied for a public defender to represent him based on the fact that his job paid only $5.50 per hour and that his sole asset was a car valued at $800. The public defender's office denied his application for counsel, concluding that his income exceeded the administrative guidelines for public defender eligibility.[4] Wolverton promptly filed a motion and affidavit of indigency with the trial court, requesting the court to appoint counsel. The court held an indigency hearing, wherein Wolverton informed the court that he earned $5.50 per hour, that he had not lived in Wisconsin long, that he had no bank account, and that he had established no credit. The court found that Wolverton's earnings were "minimal." Nonetheless, the court

---

[1] Section 947.01, Stats., provides:

> Whoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance is guilty of a Class B misdemeanor.

All Wisconsin statutory references in this opinion are to the 1991–92 statutes.

[2] Section 943.14, Stats., provides:

> Whoever intentionally enters the dwelling of another without the consent of some person lawfully upon the premises, under circumstances tending to create or provoke a breach of the peace, is guilty of a Class A misdemeanor.

[3] Section 943.10(1)(a), Stats., provides:

> Whoever intentionally enters any of the following places without the consent of the person in lawful possession and with intent to steal or commit a felony in such place is guilty of a Class C felony:
> (a) Any building or dwelling.

[4] *See* Wis. Adm. Code sec. SPD 3.01 et seq.; *see also* sec. 977.07(2), Stats.

denied Wolverton's motion, ruling that the court was bound by the public defender's administrative guidelines, and that it had no discretion to overrule the public defender's determination that Wolverton was not entitled to have counsel appointed.

Wolverton represented himself at his preliminary hearing, which was held on September 4, 1992. The State presented only one witness, Mrs. S. On direct examination, Mrs. S. identified Wolverton both as the man she saw behaving suspiciously in her neighborhood between 7:30 and 8:30 p.m. on June 13, 1992, and as the man she found in her house at 2:00 a.m. on June 14, 1992. On cross-examination, Wolverton asked Mrs. S. 24 questions concerning the plausibility of her eyewitness identification of him as the alleged intruder. However, Wolverton then proceeded with a line of questioning that the trial court found inappropriate. Consequently, the trial court terminated Wolverton's cross-examination. At the conclusion of the hearing, Wolverton was bound over for trial. He later pled "not guilty" to all charges against him.

Prior to trial, Wolverton lost his job and became eligible to have a public defender appointed to represent him. On November 25, 1992, Attorney Mary Wolfe was appointed to represent Wolverton. Thereafter, the State filed a motion to amend the information from "burglary with intent to steal" to "burglary with intent to commit a sexual assault." A motion date was set for December 21, 1992. On December 16, 1992, Attorney Wolfe filed a motion to suppress any evidence identifying Wolverton as the perpetrator of the crimes in question. In particular, she sought to suppress the two showup identifications that occurred while Wolverton was sitting alone in the back seat of the squad car. Attorney Wolfe also filed a motion to dismiss the infor-

mation, a motion and demand for discovery, and a motion to modify bail.

On December 21, 1992, the trial court heard and granted the State's motion to amend the information. At that time, Attorney Wolfe moved for a continuance on her suppression motion. The court summarily denied both the request for a continuance and the motion to suppress. Attorney Wolfe did not renew the motion to suppress, because she later came to believe that it lacked merit.

On January 5, 1993, Wolverton's case went to trial. At trial, the following people positively identified Wolverton as the perpetrator of one or more of the alleged crimes: Officer Papenfuss, Officer Graham, M.R., Mr. R., Mr. W., C.S., Mrs. S., and Mr. S.

During its case-in-chief, the State put Detective Dan Razner on the stand. Detective Razner testified that on November 30, 1992, he found a very flexible, thin piece of metal in Wolverton's wallet. Over objection by Attorney Wolfe, Detective Razner testified that the piece of metal "could have been used" to unlatch the eye-hook locking device on the screen door at Mr. and Mrs. S.'s home, "depend[ing] on how tight the locking device was at the time." Detective Razner also testified that he had examined the lock at the S. residence, and that the locking device had been tightened sometime after June 14, 1992.

At the close of the two day trial, the jury found Wolverton guilty on all counts. Wolverton received the maximum sentence for each crime: ten years for burglary; nine months for criminal trespass to a dwelling; and 90 days for disorderly conduct. Wolverton subsequently moved for a new trial, but the court denied the motion on its merits. Wolverton then appealed from the judgment of conviction and from the denial of his post-

conviction motion. The court of appeals certified the appeal to this court, and we accepted the appeal pursuant to sec. 809.61, Stats.[5]

## PART I

Wolverton argues that he was denied his constitutional right to counsel at his preliminary hearing. Under the Sixth Amendment[6] and the Fourteenth Amendment[7] to the United States Constitution, every defendant in a criminal prosecution has a constitutional right to counsel at all " 'critical' stages" of the prosecution. *United States v. Wade,* 388 U.S. 218, 224 (1967). Thus, the first subissue that arises in this case is whether a preliminary hearing conducted pursuant

---

[5] Section 809.61, Stats., provides:

 The supreme court may take jurisdiction of an appeal or other proceeding in the court of appeals upon certification by the court of appeals or upon the supreme court's own motion. The supreme court may refuse to take jurisdiction of an appeal or other proceeding certified to it by the court of appeals.

[6] The Sixth Amendment to the United States Constitution provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defense."

[7] The Fourteenth Amendment to the United States Constitution provides in pertinent part:

 No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

to sec. 971.02(1), Stats.,[8] is a "critical stage" of the Wisconsin criminal process. We hold that it is.[9]

The United States Supreme Court has held that a preliminary hearing conducted pursuant to Alabama law is a "critical stage" of the Alabama criminal process at which an accused is as much entitled to the assistance of counsel as at the trial itself. *Coleman v. Alabama,* 399 U.S. 1, 9 (1970). The Alabama preliminary hearing at issue in *Coleman* and the Wisconsin preliminary hearing are nearly identical in all respects. They both serve the same purpose,[10] and they both provide the accused with an opportunity to cross-

---

[8] Section 971.02(1), Stats., mandates a preliminary hearing for any defendant charged with a felony, unless the defendant waives the hearing or is a corporation.

[9] We note that on numerous occasions the courts of this state have summarily stated that a preliminary hearing is a critical stage of a prosecution at which a defendant is entitled to the assistance of counsel. *See, e.g., State v. Moats,* 156 Wis. 2d 74, 116, 457 N.W.2d 299 (1990); *State ex rel. Funmaker v. Klamm,* 106 Wis. 2d 624, 634, 317 N.W.2d 458 (1982); *State ex rel. Perry v. Wolke,* 71 Wis. 2d 100, 111, 237 N.W.2d 678 (1976); *Gates v. State,* 91 Wis. 2d 512, 522, 283 N.W.2d 474 (Ct. App. 1979).

[10] The Alabama preliminary hearing at issue in *Coleman* and the Wisconsin preliminary hearing share essentially the same purpose: to determine whether there is probable cause to believe that a crime has been committed and whether the accused is probably guilty of committing that crime. *Coleman,* 399 U.S. at 8 n.3.; sec. 970.03(1), Stats.; *see also Moats,* 156 Wis. 2d at 83. However, unlike the Alabama preliminary hearing, which is not a required step in an Alabama prosecution, *Coleman,* 399 U.S. at 8, the Wisconsin preliminary hearing is a required step whenever a defendant is charged with a felony. Section 971.02(1), Stats.

examine witnesses presented by the state. Under *Coleman,* the Wisconsin preliminary hearing is undoubtedly a "critical stage" of the Wisconsin criminal process. Hence, every defendant charged with a felony in Wisconsin is constitutionally entitled to the assistance of counsel at the preliminary hearing. Because Wolverton was charged with a felony, he was statutorily entitled to a preliminary hearing and constitutionally entitled to have counsel present at the preliminary hearing.[11] We next consider whether Wolverton waived his right to postconviction appellate review of the denial of counsel at his preliminary hearing. "No procedural principle is more familiar . . . than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right." *Michel v. Louisiana,* 350 U.S. 91, 99 (1955) (quoting *Yakus v. United States,* 321 U.S. 414, 444 (1944)), *reh'g denied,* 350 U.S. 955 (1956). This principle applies to both federal procedures and state procedures. *Francis v. Henderson,* 425 U.S. 536, 541–42 (1976) (holding that the right to object to composition of a grand jury on constitutional grounds is waived under Louisiana law unless raised by motion prior to trial); *cf. Davis v. United States,* 411 U.S. 233, 238 (1973) (holding that the right to object to composition of a grand jury on constitutional grounds is waived under Fed. R. Civ. P. 12(b)(2) unless raised by motion prior to trial). Thus, states "may attach reasonable time limitations to the assertion of federal constitutional rights" and may require timely assertion of those

---

[11] Although the right to counsel at a preliminary hearing is constitutionally guaranteed, the right to a preliminary hearing is purely statutory. *Moats,* 156 Wis. 2d at 83.

rights. *Michel,* 350 U.S. at 97.[12] A state time limitation is reasonable if "the defendant has had a 'reasonable opportunity to have the issues as to the claimed right heard and determined' by the State court." *Id.* at 93.

The law in Wisconsin is clear: "A defendant who claims error occurred at the preliminary hearing may only obtain relief *prior to trial.*" *Webb,* 160 Wis. 2d at 628, 636. More specifically, a defendant who claims that he or she was denied a constitutional right at the preliminary hearing must seek immediate review in the court of appeals by filing an appeal from the nonfinal order that allegedly denied the constitutional right. *Id.* at 631, 636. The failure to appeal from the nonfinal order constitutes a waiver of the right to postconviction appellate review of the issue. *See Webb,* 160 Wis. 2d at 636. However, if the defendant appeals from the nonfinal order, but the court of appeals does not accept the discretionary appeal, the issue of error at the preliminary hearing is preserved and the defendant may raise it on appeal from any subsequent conviction. If the issue is so preserved, the test to be applied by the appellate court is whether the error at the preliminary hearing affected the trial so that it constitutes prejudicial error under *Chapman. v. California,* 386 U.S. 18 (1967).[13] If the court finds that the error at the prelimi-

---

[12] "A state procedural rule which forbids the raising of federal questions at late stages in the case, or by any other than a prescribed method, has been recognized as a valid exercise of state power." *Michel,* 350 U.S. at 97 n.4 (citing *Williams v. Georgia,* 349 U.S. 375, 382–83 (1955)).

[13] The claimed error in this case is that Wolverton, an indigent defendant, was denied the right to appointed counsel at his preliminary hearing. In *Coleman,* 399 U.S. at 11, the Court stated that "[t]he test to be applied is whether the denial of

nary hearing prejudiced the trial, the court must vacate the judgment and remand for a new preliminary hearing and a new trial.

This judicially created rule of law is rooted in a host of legitimate state interests. Relief must be sought prior to trial so that the alleged error can be scrutinized and, if necessary, cured before the state, the witnesses, and the parties have gone to the burden, trauma, and expense of a trial. *See id.* at 629. If defendants were allowed to seek relief after trial as a matter of course, strong tactical considerations would militate in favor of delaying the raising of the claim of error. Defendants would realize that a pretrial attack might simply result in a new preliminary hearing prior to trial. On the other hand, a postconviction attack could possibly be used to upset an otherwise valid conviction. This result would not only waste judicial and prosecutorial resources, but would also put victims and witnesses through the trauma of testifying at a second trial. *Id.* at 631. Moreover, memories of the events surrounding the alleged crime may fade and material witnesses may die or leave the jurisdiction by the time the second trial is conducted. Finally, if defense lawyers were permitted to seek postconviction relief as a matter of course, they would have an incentive to "sandbag" during the trial in order to conceal their defense strategy, while unraveling the state's strategy. This litany of undesirable results is generally avoided by the rule of *Webb:* defendants who claim that an error occurred at the preliminary hearing must seek relief prior to trial.

Prior to his preliminary hearing, Wolverton claimed that he was indigent and applied for public

counsel at the preliminary hearing was harmless error under *Chapman,"* 386 U.S. 18.

defender representation. The public defender's office denied his application, concluding that his income of $5.50 per hour exceeded the administrative guidelines for public defender representation. Wolverton immediately filed a motion and affidavit of indigency with the trial court, requesting the trial court to appoint counsel. Although it found that Wolverton's earnings were minimal, the trial court denied his motion to appoint counsel, ruling that it was bound by the public defender's administrative guidelines, which are promulgated pursuant to sec. 977.02(3), Stats.,[14] and the public defender's determination of indigency, which was based on those guidelines.

As the State concedes, "[t]he right of an indigent to counsel does not hinge on the indigency criteria the public defender follows." *Appointment of Counsel in State v. Pirk,* 175 Wis. 2d 503, 506, 499 N.W.2d 280 (Ct. App. 1993).[15] Thus, in the case at bar, the trial court erroneously exercised its discretion when it ruled that the public defender's administrative guidelines and indigency determination were binding on the court. An indigent defendant in a criminal prosecution has a con-

---

[14] Section 977.02, Stats., provides in pertinent part:

The [public defender] board shall:

. . ..

(3) Promulgate rules regarding the determination of indigency of persons entitled to be represented by counsel, including the time period in which the determination must be made and the criteria to be used to determine indigency and partial indigency.

[15] Although *Pirk* was decided after Wolverton's case went to trial, we cite the case because it further clarifies the trial court's duty under *State v. Dean,* 163 Wis. 2d 503, 471 N.W.2d 310 (Ct. App. 1991). Because we hold that Wolverton waived his right to postconviction appellate review of the issue, *Pirk* does not affect the outcome of Wolverton's appeal.

stitutional right to appointed counsel. *State v. Scarbrough,* 55 Wis. 2d 181, 186, 197 N.W.2d 790, 792 (1972). The legislature cannot limit that right. *State v. Dean,* 163 Wis. 2d 503, 513, 471 N.W.2d 310 (Ct. App. 1991). Therefore, in reviewing a claim of indigency, the trial court may not restrict itself to the criteria set forth by the legislature in sec. 977.07(2), Stats., and the administrative guidelines promulgated pursuant to sec. 977.02(3). *Dean,* 163 Wis. 2d at 514.

Some criminal defendants do not meet the public defender's indigency criteria, but nevertheless are unable to afford counsel. *Dean,* 163 Wis. 2d at 512. "It is within the inherent power of the courts to appoint counsel for the representation of indigents." *State ex rel. Fitas v. Milwaukee County,* 65 Wis. 2d 130, 134, 221 N.W.2d 902 (1974). The trial court must exercise this inherent power[16] and "go beyond the public defender's determination that a defendant does not meet the legislative criteria and determine whether the 'necessities of the case' and the demands of 'public

---

[16] This power and duty [is] based on common law and supported by arguments from [the Sixth Amendment to the United States Constitution and] the various provisions of sec. 7, art. I of the Wisconsin constitution providing an accused with the right to assistance of counsel and with other rights calculated as necessary to secure a fair trial; the justice and humane result arising from the exercise of such power; the interest of the public in the correct and fair administration of its criminal laws; and the practice of the courts from the first organization of the government.

*Sparkman v. State,* 27 Wis. 2d 92, 98–99, 133 N.W.2d 776, 780 (1965). The creation of the public defender's office did not negate the inherent power of the court to appoint counsel for indigent defendants. *See Contempt in State v. Lehman,* 137 Wis. 2d 65, 77, 403 N.W.2d 438, 444 (1987); *Pirk,* 175 Wis. 2d at 506; *Dean,* 163 Wis. 2d at 513.

257

justice and sound policy' require appointing counsel." *Dean,* 163 Wis. 2d at 513 (citing *Sparkman v. State,* 27 Wis. 2d 92, 98–99, 133 N.W. 2d 776, 780 (1965)). In making this determination, the trial court "must consider whether the defendant has sufficient assets to retain private counsel at the market rate prevailing in the community." *Id.* at 514. If the trial court concludes that the defendant is indigent, albeit not under the public defender's criteria, the court should appoint counsel from the private bar. *Pirk,* 175 Wis. 2d at 506 (citing *State ex rel Chiarkas v. Skow,* 160 Wis. 2d 123, 138–39, 465 N.W.2d 625, 630–31 (1991)).

On appeal from the judgment and conviction against him, Wolverton claims for the first time that as a result of the trial court's erroneous exercise of discretion at his indigency hearing, he was denied his right to the assistance of appointed counsel at his preliminary hearing. After his preliminary hearing, Wolverton lost his job and became eligible for public defender representation. Attorney Wolfe was appointed to represent him. Subsequently, Attorney Wolfe filed a motion to dismiss the information, a motion to suppress evidence, a motion and demand for discovery, and a motion to modify bail. She did not, however, file an appeal from the nonfinal order denying Wolverton's motion to appoint counsel as required by *Webb,* nor did she pursue any other avenue of pretrial relief.

Under sec. 809.50, Stats.,[17] a person may appeal from a nonfinal judgment or order by filing a petition within ten days of "the entry of the judgment or order."

---

[17] Section 809.50(1), Stats., provided in pertinent part:

A person shall seek leave of the court to appeal a judgment or order not appealable as of right under s. 808.03(1) by filing within 10 days of the entry of the judgment or order a petition and supporting memorandum, if any . . ..

An order is "entered" when it is filed in the office of the clerk of the circuit court. Section 807.12(2). It is undisputed that a written order of non-indigency was never entered in this case.

■

Wolverton argues that because a written order was never entered, neither he nor his attorney could pursue an appeal under sec. 809.50(1), Stats. *See State v. Borowski,* 164 Wis. 2d 730, 734, 476 N.W.2d 316, 318 (Ct. App. 1991) (stating that sec. 809.50(1), "contemplates entry of a written order before a petition can be filed"). This argument is without merit. Wolverton had ample opportunity to file an appeal and have his claim of error heard. The ten-day time limit under sec. 809.50 does not begin to run until a judgment or order is entered. Because an order of nonindigency was never entered in this case, the ten-day time limit never began to run. Thus, if Attorney Wolfe believed that Wolverton's indigency status was improperly determined or that he was in any way prejudiced by the lack of representation at his preliminary hearing, she could have moved the trial court to enter an order of nonindigency and then filed an appeal from the nonfinal order within ten days.[18] Because Attorney Wolfe did not do so, Wolverton is deemed to have waived his right to appeal and, consequently, his right to appointed counsel at the preliminary hearing. In short, Wolverton failed to avail

---

[18] If the court of appeals accepts the appeal from the nonfinal order and concludes that the trial court erroneously exercised its discretion in reviewing a defendant's indigency claim, the appropriate remedy is to remand the case to the trial court for a new indigency hearing. If on remand the trial court concludes that the defendant is indigent, the defendant is then entitled to be represented by appointed counsel at a new preliminary hearing.

himself of adequate remedies under Wisconsin law by following the procedure mandated by *Webb*.

## PART II

■■■■ Wolverton also seeks a new trial on the ground that the trial court violated his statutory right to cross-examine witnesses at the preliminary hearing when it cut off his questioning of the State's sole witness at the hearing. This argument is closely akin to Wolverton's arguments regarding the denial of counsel at his preliminary hearing. The common thread is that Wolverton is seeking a new trial based on an error that allegedly occurred at the preliminary hearing. The same rule of law applies: "A defendant who claims error occurred at the preliminary hearing may only obtain relief *prior to trial.*" *Webb,* 160 Wis. 2d at 628, 636 (emphasis added). Because Wolverton did not seek relief prior to trial, we conclude that under *Webb,* he waived his right to postconviction appellate review of whether he was erroneously denied his statutory right to cross-examine witnesses at the preliminary hearing. If Wolverton wished to contest this issue, he should have sought immediate review in the court of appeals by filing an appeal from the nonfinal order. *Id.* at 631, 636.

If Wolverton had not waived his right to postconviction appellate review on this issue, and we were faced with considering the merits of his argument, we would easily conclude that it is entirely without merit. On direct examination at the preliminary hearing, Mrs. S. identified Wolverton both as the man who behaved suspiciously in her neighborhood between 7:30 and 8:30 p.m. on June 13, 1992, and as the man she found hiding in her house at approximately 2:00

a.m. on June 14, 1992. On cross-examination, Wolverton posed 24 questions to Mrs. S. concerning the plausibility of her identification of him as the alleged burglar. Wolverton then proceeded with the following line of questioning:

Q: You are real protective of your daughter?
A: I am not sure I understand your question.
Q: Are you looking after her a lot? .

THE COURT: I don't understand the question either. This is not a discovery proceeding, Mr. Wolverton. The issue is plausibility.

WOLVERTON: I'm trying to figure out why she would react the way she did and call the police on somebody like that—

THE WITNESS: —I can tell you why I'd do that?

THE COURT: Want to?

THE WITNESS: My daughter was very frightened because there was a man [who] was watching her across the street, and was also going down 12th Street, and she was very frightened that night, and that's why I checked her; I checked her twice that night. That was the second time I checked her, because of my concern for her being frightened, and wanted to make sure she was sleeping okay.

WOLVERTON:

Q: So you overreacted and called the police?
A: I did not overreact because—I don't know if I want to continue with this questioning with you. .

THE COURT: I don't either. That's all, ma'am; you may step down. Thank you. Anything further from the State?

261

Section 970.03(5), Stats.,[19] entitles a defendant to cross-examine witnesses at the preliminary hearing. It does not entitle a defendant to harass or embarrass witnesses at the hearing. The trial court has broad discretion to determine the proper scope of cross-examination at a preliminary hearing. *State ex rel. Huser v. Rasmussen,* 84 Wis. 2d 600, 615, 267 N.W.2d 285 (1978). The court may exercise this discretion and limit the cross-examination in order to protect witnesses from harassment and undue embarrassment. *Cf.* sec. 906.11(1).[20] This is precisely what the trial court did in this case when Wolverton crossed the line of impropriety. Hence, even if Wolverton had not waived his right to review, we would conclude that the trial court exercised sound discretion when it ended his cross-examination at the point where he reverted from questions concerning the plausibility of Mrs. S.'s identification of him to questions accusing her of bad parenting and "overreacting" to his uninvited presence in her home at 2:00 a.m. on June 14, 1992.

## PART III

Wolverton argues that the trial court committed reversible error when it denied his motion to suppress

---

[19] Section 970.03(5), Stats., provides in pertinent part: "The defendant may cross-examine witnesses against him, and may call witnesses on his own behalf who then are subject to cross-examination."

[20] Section 906.11(1), Stats., provides:

The judge shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (a) make the interrogation and presentation effective for the ascertainment of the truth, (b) avoid needless consumption of time, and (c) protect witnesses from harassment or undue embarrassment.

identification evidence resulting from two "impermissibly suggestive" pretrial showups,[21] and when it refused to grant a continuance to enable his trial attorney to better prepare for the suppression motion. We disagree. Wolverton has failed to demonstrate that the two showups at issue in this case were impermissibly suggestive.[22] Even if he could show that they were impermissibly suggestive, the record reflects that under the totality of the circumstances, the identifications were reliable and, therefore, admissible at trial.[23]

[21] A "showup" is an out-of-court pretrial identification procedure in which a suspect is presented singly to a witness for identification purposes. *See Stovall v. Denno,* 388 U.S.293, 302 (1967) (stating that a showup is "the practice of showing suspects singly to persons for the purpose of identification, and not part of a lineup").

[22] The trial court dismissed Wolverton's motion to suppress the showup identifications, but it did not make any findings regarding the suggestiveness of the showups or the reliability of the identifications. Our decision is consistent with the opinion of Wolverton's trial counsel, who was deposed as a result of Wolverton's postconviction motion. In her deposition, Attorney Wolfe stated that she did not renew her motion to suppress the identifications because, after reviewing the circumstances surrounding the showups, she concluded that the motion lacked merit. Even if the trial court had held a full suppression hearing and had made factual findings, we would independently review those findings because the facts at issue are constitutional facts. *See e.g., State v. Griffin,* 131 Wis. 2d 41, 62, 388 N.W.2d 535, 543 (1986), and we would undoubtedly conclude, based on the record before us, that the showup identifications were reliable.

[23] Wolverton impliedly argues that this court cannot determine from the record whether the identifications were reliable. Thus, according to Wolverton, his conviction must be reversed and the case must be remanded for a new suppression hearing. However, Wolverton cites no authority for this proposition, and we find it unpersuasive. The record in this case contains ample

Because we conclude that the evidence was admissible, we need not address whether the trial court properly denied Attorney Wolfe's request for a continuance to better prepare for the suppression motion.[24]

A criminal defendant is denied due process when identification evidence admitted at trial stems from a pretrial police procedure that is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384 (1968). Showups, however, are not *per se* impermissibly suggestive. *State v. Streich,* 87 Wis. 2d 209, 214, 274 N.W.2d 635 (1979); *State v. Isham,* 70 Wis. 2d 718, 725, 235 N.W.2d 506 (1975). Rather, a criminal defendant bears the initial burden of demonstrating that a showup was impermissibly suggestive. *State v. Mosley,* 102 Wis. 2d 636, 652, 307 N.W.2d 200 (1981); *Powell v. State,* 86 Wis. 2d 51, 65, 271 N.W.2d 610 (1978). If this burden is met, the burden shifts to the state to demonstrate that "under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Manson v. Brathwaite,* 432 U.S. 98, 106 (1977) (citing *Neil v. Biggers,* 409 U.S. 188, 199 (1972); *Mosley,* 102 Wis. 2d at 652; *Powell,* 86 Wis. 2d at 65–66. In determining whether an identification was reliable

evidence demonstrating that the showup identifications were reliable.

[24] At a motion hearing on December 21, 1992, Attorney Wolfe moved for a continuance on the suppression motion that she had previously filed on Wolverton's behalf. The court summarily denied both the request for a continuance and the motion to suppress. Attorney Wolfe did not renew the motion to suppress, because she later came to believe that it lacked merit.

despite the suggestive nature of the police procedure, the following factors are relevant:

> [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of his prior description of the criminal, [4] the level of certainty demonstrated at the confrontation, and [5] the time between the crime and the confrontation.

*Manson,* 432 U.S. at 114 (citing *Biggers,* 409 U.S. at 199–200); *Powell,* 86 Wis. 2d at 65 (citing *Biggers,* 409 U.S. at 199–200; *Manson,* 432 U.S. at 114).

Wolverton contends that the two showups in this case were impermissibly suggestive simply because, on both occasions, he was exhibited to witnesses while sitting alone in the back seat of a police car. We disagree. The mere fact that a suspect was sitting in a police car is insufficient to demonstrate that the showup was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons,* 390 U.S. at 384. To hold otherwise would be tantamount to holding that all showups are impermissibly suggestive, which would run counter to our prior decisions stating that showups are not *per se* impermissibly suggestive. *Streich,* 87 Wis. 2d at 214; *Isham,* 70 Wis. 2d at 725. However, even if the two showups in this case were impermissibly suggestive, the record compels the conclusion that under the totality of the circumstances, the identifications were reliable.

The first showup took place during daylight at approximately 8:30 p.m. on June 13, 1992. In response to a report that a man was suspiciously walking up and down driveways, Officer Papenfuss proceeded to the

residence of Mr. and Mrs. S. As his squad car approached, Mr. and Mrs. S. flagged him down and pointed out the suspicious man, who was walking approximately 75 yards away. Officer Papenfuss pursued and stopped the man, who identified himself as Randall Wolverton. Officer Papenfuss then returned with Wolverton in the back seat of the squad car to where Mr. S. was still standing. From approximately ten feet away, Mr. S. identified the man in the back seat of the squad car as the person he saw acting suspiciously. At trial, Mr. S. again identified Wolverton as the person he saw acting suspiciously on June 13, 1992. Corroborating this identification, Mrs. S. testified at trial that from inside the house, she too could see that the man in the squad car was the same man she saw acting suspiciously on June 13, 1992. In addition, Mrs. S. and C.S. testified unwaveringly that they saw the same man in their living room at 2:00 a.m. the next morning. They were able to identify him by his attire, his build, and his hair.

Thus, the record reflects that Wolverton was observed and identified by three individuals on multiple occasions. On each occasion, the witness was focusing directly on Wolverton. Because Mr. S. pointed out Wolverton to Officer Papenfuss, there is no question concerning the accuracy of Mr. S.'s description. The description given to the police by Mrs. S. after Wolverton broke into her house was also accurate. None of the witnesses wavered in their out-of-court or in-court identifications. Finally, less than one hour passed between when C.S. was first frightened by Wolverton and when he was first identified in the back seat of the squad car. Only a few hours passed before Mrs. S. and C.S. saw Wolverton in their home and accurately described him to the police.

Given the multiple observations and identifications, the high level of attention paid to Wolverton, the fact that Mr. S. pointed Wolverton out to Officer Papenfuss, the unwavering out-of-court and in-court identifications, and the short interval of time between when Wolverton was seen acting suspiciously and when he was identified in the squad car, we conclude that the identifications resulting from the first showup were completely reliable.[25]

The second showup occurred at approximately 10:30 p.m. on June 13, 1992. In response to a complaint that a man had accosted nine-year-old M.R., Officer Papenfuss arrested Wolverton, placed him in the back seat of the squad car, and drove to the residence of Mr. and Mrs. R. There, M.R. identified Wolverton as the man she had encountered at the backyard fence approximately 30 minutes earlier. Corroborating this identification, Mr. R. and Mr. W. each identified Wolverton as the man they had chased immediately after M.R. informed them of the backyard encounter.

Although it was fairly dark outside when M.R. encountered the stranger at her backyard fence, she testified at trial that she nonetheless was able to view the man's face, hair, and clothing and that, a short time later, she saw the same man sitting in the back seat of Officer Papenfuss's squad car. Mr. W. testified that within minutes after M.R. reported her backyard encounter, he chased the man that M.R. described and confronted him face-to-face. Mr. W. further testified

---

[25] We note that the first showup in this case occurred before Wolverton was identified as the man who had intruded into the home of Mr. and Mrs. S. Thus, arguably the identification from the first showup is irrelevant to the identification of Wolverton as the man who unlawfully entered the home of Mr. and Mrs. S.

that this was the same man who was sitting in the back of Officer Papenfuss's squad car. Finally, Mr. R. testified that he too chased the man described by his daughter and that he obtained his license plate number as he was driving away. Mr. R. further testified that the man he chased was the man who was sitting in the rear seat of the squad car. This identification was further bolstered by the license check, which revealed that the fleeing vehicle was registered to Wolverton.

■

As with the first showup, multiple witnesses observed and identified Wolverton prior to the second showup, and each witness focused his or her attention on Wolverton. Each of the witnesses accurately described Wolverton prior to his arrest, and positively identified him out of court and in court. Finally, a short interval of time lapsed between when Wolverton spoke with M.R. and when he was identified in the squad car. Hence, the identifications resulting from the second showup were completely reliable.

In sum, we conclude that the showups in this case were not impermissibly suggestive. We further conclude that even if they were impermissibly suggestive, the record compels the conclusion that under the totality of the circumstances, the showup identifications were reliable and, thus, admissible at trial. There was no likelihood of misidentification in this case.[26]

---

[26] Wolverton also argues that he received ineffective assistance of counsel because Attorney Wolfe failed to further pursue the motion to suppress and to force the State to prove that the out-of-court identifications were reliable. An attorney provides ineffective assistance of counsel if (1) the attorney's performance is deficient, and (2) the deficient performance is prejudicial to the defendant. *State v. Johnson,* 133 Wis. 2d 207, 216, 395 N.W.2d 176 (1986). Neither of these elements is met here. First,

## PART IV

Wolverton argues that the trial court committed reversible error in admitting a police officer's opinion testimony that a thin piece of metal found in Wolverton's wallet five months after he was charged with burglary could be used to unlatch the type of locking device found on the screen door at the residence of Mr. and Mrs. S. Outside the presence of the jury, the State proffered evidence that while Wolverton was in the Fond du Lac county jail, Detective Dan Razner found in Wolverton's wallet an extremely thin piece of metal, which could be used to unlatch an eye-hook type lock. Attorney Wolfe objected that, because the piece of metal was found five months after the intrusion at the residence of Mr. and Mrs. S., it was too remote to be relevant. The trial court disagreed. Detective Razner then testified about his discovery, and the piece of metal was introduced into evidence.

Detective Razner also testified that on November 30, 1992, he examined the eye-hook locking device on the front screen door at the residence of Mr. and Mrs. S., noting that Mr. S. had tightened the lock after the June break-in. When the prosecutor asked Detective Razner to opine whether the metal strip found in Wolverton's wallet could be used to unlatch an eye-hook type lock, Wolverton objected on the ground of lack of foundation as to Detective Razner's knowledge. The detective replied that he had over 13 years of experience as a police officer. The trial court then overruled the objection. Detective Razner proceeded to testify

an attorney is not required to pursue a motion that clearly lacks merit. Second, because we conclude that the identifications were admissible, Wolverton was not prejudiced by Attorney Wolfe's decision not to renew the suppression motion.

that, in his opinion, the metal strip "could have been used" to unlatch an eye-hook type lock, "depend[ing] on how tight the locking device was at the time." Wolverton maintains that this testimony was irrelevant and lacked foundation, and that it wrongly "could have caused the jury to convict [him] based on his bad character."

Without passing judgment on the merits of this argument, we conclude that even if the testimony should have been excluded, its admission was harmless. There is no reasonable possibility that it could have affected the jury's verdicts on the charges of burglary, sec. 943.10(1)(a), Stats., or criminal trespass to a dwelling, sec. 943.14. To violate these statutes, one need only enter the dwelling of another without consent. Breaking into the dwelling is not an element of the crime. Furthermore, Detective Razner's opinion concerning the metal strip was not critical to the issue of Wolverton's identity as the intruder at the residence of Mr. and Mrs. S. Both Mrs. S. and C.S. positively identified Wolverton as the intruder. Their identifications were predicated upon evidence that they both saw the intruder at close range in the illuminated living room of their house and that they had seen the same man engaging in suspicious activity only a few hours earlier.

### PART V

Lastly, Wolverton seeks reversal on the ground that the evidence at trial was insufficient to support a conviction of burglary with intent to commit a sexual

assault.[27] Specifically, Wolverton argues that no evidence was presented at trial from which a reasonable jury could infer beyond a reasonable doubt that Wolverton intended to commit a first-degree sexual assault of a child. We disagree.

The principles governing review of whether sufficient evidence existed to sustain a conviction are well-settled:

[A]n appellate court may not substitute its judgment for that of the trier of fact unless the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt. *If any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, an appellate court may not overturn a verdict* even if it believes that the trier of fact should not have found guilt based on the evidence before it.

*State v. Poellinger,* 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990) (citations omitted) (emphasis added).

The record indicates that, on the night of June 13, 1992, Wolverton had an extraordinary interest in young girls. C.S. testified that he was "staring" at her on the playground. M.R. testified that while zipping up

---

[27] This charge has four elements: (1) that the defendant intentionally entered the house; (2) that the defendant entered the house without the consent of a person in lawful possession; (3) that the defendant knew the entry was without such consent; and (4) that the defendant entered the house with intent to commit first-degree sexual assault of a child. *See* Wis. J.I.—Criminal 1424 (1994).

his pants Wolverton asked her if she wanted to make some money. When M.R. ran away and told her parents, Wolverton did not attempt to clear up any misunderstanding. Instead, he fled and eventually drove away with his headlights off. Even incarceration apparently did not curb Wolverton's interest in young girls. After being released, he returned to the same neighborhood and specifically to the one house in the neighborhood with a sign proclaiming a girl's tenth birthday. At 2:00 a.m. that same night, Mrs. S. testified that she found Wolverton crouched just a few feet away from where her daughter was sleeping. Wolverton fled without stealing anything from the house. Based on this evidence, a reasonable jury could properly infer that Wolverton entered the home of Mr. and Mrs. S. with the intent to sexually assault C.S. Thus, we conclude that sufficient evidence existed to support the verdict.

*By the Court.*—The judgment of the Fond du Lac county circuit court is affirmed.