State of Wisconsin, Plaintiff-Respondent,
v.
Tyrone L. Dubose, Defendant-Appellant.
No. 03-1690-CR.
Court of Appeals of Wisconsin.
Opinion Filed: March 2, 2004.
Before Cane, C.J., Hoover, P.J., and Peterson, J.
¶1. CANE, C.J.
Tyrone Dubose appeals from a judgment of conviction for armed robbery. He claims the trial court erred by not suppressing Timothy Hiltsley's identification of him as the armed robber because it was either the fruit of an illegal arrest or was the product of impermissible suggestiveness. We affirm the judgment.

Background
¶2. On January 9, 2002, around 1 a.m., Hiltsley left a bar in Green Bay with his friend, Ryan Boyd. Hiltsley had been drinking and was at that time "buzzed." Outside, they ran into a group of people, which included Dubose. Hiltsley recognized Dubose as a patron of a liquor store where he used to work. Hiltsley, Boyd, Dubose, and another decided to go back to Hiltsley's house to smoke marijuana. They left together in Hiltsley's vehicle, made one stop along the way, and arrived at the house shortly thereafter. About five to ten minutes after arriving, Dubose pulled out a gun, put it against Hiltsley's temple, and told him to empty his wallet. Hiltsley complied, and Dubose and the other person left.
¶3. Shortly after the robbery, a neighbor who lived a few doors down from Hiltsley called the police complaining of a possible burglary. She said she saw two people run out of a house next to hers and head eastbound down Division Street. She described one of the individuals as wearing a large flannel shirt with a hood. The police responded to the call at approximately 1:21 a.m.
¶4. Meanwhile, Hiltsley and Boyd ran out of the house and started chasing the suspects, but then Hiltsley and Boyd got into Boyd's car and drove after the suspects, hoping to cut them off. A block and a half later, at the intersection of Division and North Norwood Avenue, Hiltsley got out of the car to look for Dubose and the other person while Boyd began circling the neighborhood. Hiltsley headed south on Norwood and flagged down a police vehicle that was responding to the burglary call. He told the officer he was robbed at gunpoint. He described the suspects as two African-American males, one around five-feet-six-inches tall, and the other a bit taller.
¶5. Officer Jeffrey Engelbrecht was also responding to the burglary call. He was about six blocks away from the scene. Dispatch indicated that two suspects were involved, one wearing a large flannel shirt with a hood. As he neared the site of the call, Engelbrecht observed two individuals walking eastbound on Division, about a half-block away from Hiltsley's residence. One of them wore a large checkered flannel shirt with a hood. Engelbrecht was unable to determine their race. When he turned his squad car (which did not have its emergency lights on) north onto Norwood, the two individuals ran eastbound on Division, across Norwood, and then darted between two houses in a northeasterly direction. Engelbrecht lost sight of them. He notified headquarters that he just observed two possible suspects. He then drove one block north, stopped at the intersection of Norwood and Kellogg Street, radioed to set up a one-block perimeter to contain the fleeing suspects and called for a canine unit. The perimeter was set up within a minute and a half.
¶6. Engelbrecht then received word that two other officers were dispatched to Hiltsley's address, 943 Division Street, for an armed robbery. Dispatch indicated the suspects involved were two African-American males. Dispatch further advised that this call may be related to the burglary call.
¶7. Approximately fifteen minutes later deputy Timothy Newtols and his canine partner, Rocky, arrived. Engelbrecht informed Newtols a possible armed robbery suspect was in the area and took Newtols and Rocky to the last place he saw the two possible suspects. Rocky immediately began tracking eastbound. He went through several backyards until he stopped and detained (terminology used for when a canine barks and holds) at a backyard fence at 807 Kellogg Street. This house was located within the one-block perimeter. Newtols ordered whoever was hiding behind the fence to come out, and Dubose, an African-American male, complied. Dubose was not wearing a flannel shirt.
¶8. Engelbrecht directed Dubose to the ground and placed him in custody. After learning Dubose's identity, Engelbrecht moved him to the rear of a squad car and searched him. The search did not uncover the weapon, the money or any other contraband. Engelbrecht then double-locked the handcuffs and placed Dubose in the back of a squad car, where he sat for approximately ten minutes.
¶9. An officer brought Hiltsley to the squad car where Dubose was being held to see if he could identify Dubose as one of the perpetrators. The officer told Hiltsley that they had someone who could possibly be one of the men who robbed him. The officer parked this car approximately three feet from the other car. Hiltsley, who was sitting in the backseat, looked into the other car, which was illuminated by a dome light. Based on Dubose's slender build, dress and hairstyle, Hiltsley said he was 98% sure Dubose was the man who robbed him.
¶10. Dubose and Hiltsley were taken to a police station. Dubose was placed in a room, and Hiltsley, standing behind a two-way mirror, again identified Dubose as the man who robbed him. This second identification occurred approximately fifteen minutes after the first one.
¶11. Sometime after Dubose was taken to the police station, Engelbrecht and his partner retraced Rocky's tracking pattern to see if they could locate a handgun. Near the location where Engelbrecht lost sight of Dubose and the other man when they darted between the two houses, a semi-automatic pistol was found.
¶12. Dubose was charged with one count of armed robbery. He filed a motion to suppress the identifications, arguing that they were either the fruit of an unlawful arrest or were impermissibly suggestive. The trial court denied his motion, and the matter was tried before a jury. At trial, Hiltsley again identified Dubose as the man who robbed him. The jury convicted him, and this appeal follows.

Discussion
¶13. We employ a two-step test in reviewing a circuit court's denial of a motion to suppress. First, we examine the circuit court's factual findings under the clearly erroneous standard. State v. Vorburger, 2002 WI 105, ¶32, 255 Wis. 2d 537, 648 N.W.2d 829. Second, we review independently the application of those facts to constitutional principles. Id. Dubose does not dispute any of the circuit court's factual findings, and our review of the record does not reveal that any of the factual findings are clearly erroneous. Therefore, we turn to Dubose's constitutional arguments.

I. Suppression Based On Illegal Arrest
¶14. Dubose claims the identification evidence should have been suppressed because he was arrested without probable cause. See State v. Walker, 154 Wis. 2d 158, 185-87, 453 N.W.2d 127 (1990) (lineup identification may be suppressed if it is the fruit of an unlawful arrest). The State argues that Dubose was not arrested, but rather was subject to an investigative detention for purposes of a showup identification. Alternatively, if Dubose was under arrest, the State claims there was probable cause to arrest Dubose.

A. Arrest or Investigatory Detention
¶15. An arrest occurs when, given the degree of restraint, a reasonable person in the defendant's position would have considered him or herself to be in custody. State v. Swanson, 164 Wis. 2d 437, 446-47, 475 N.W.2d 148 (1991). To make this determination, we look at the totality of the circumstances, id. at 446, and because each case must be examined under its own facts, we are not bound by hard and fast rules. State v. Wilkens, 159 Wis. 2d 618, 626, 465 N.W.2d 206 (Ct. App. 1990).
¶16. The State argues Dubose was not under arrest, but rather was subject to an investigatory stop.
For the stop of a person to pass constitutional muster as investigatory, the detention must be temporary and last no longer than is necessary to effect the purpose of the stop. "Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." ... In assessing a detention's validity, courts must consider the "`totality of the circumstances-the whole picture,'" because the concept of reasonable suspicion is not "`readily, or even usefully, reduced to a neat set of legal rules.'" The manner in which a temporary detention of a suspect is created must be gauged by a standard of reasonableness.
Id. at 625-26 (citations omitted).
¶17. The State argues that none of the officers' actions, individually or in the aggregate, are incompatible with an investigatory stop. In support of its argument, the State calls attention to Wilkins and State v. Pounds, 176 Wis. 2d 315, 500 N.W.2d 373 (Ct. App. 1993).
¶18. In Wilkins, police responded to a dispatch involving a screaming woman being dragged into a garage. The police arrived at the given address and spoke to a witness who pointed out that the suspects were in an automobile that was fortuitously passing that address right then. Id. at 626. The police immediately stopped the passing vehicle, ordered the occupants out (one of whom was Wilkins), handcuffed them, and placed them in separate squad cars, id. at 626-27, for approximately an hour to an hour and twenty minutes. Id. at 628. In the meantime, the police searched for and located the victim, returned her to the crime scene, received her statement, and then took her to the stopped vehicles to identify the suspects. She identified Wilkins as one of the assailants. Id. at 627-28. On these facts, we concluded Wilkins' detention did not ripen into an arrest. Id. at 628.
¶19. In Pounds, a police officer stopped the vehicle Pounds and two other persons were in because the vehicle did not match the license plate registration information. The officer issued the driver a citation, informed him that the vehicle was going to be towed, and told all three of the occupants that they were free to leave. Id. at 318. Pounds and the driver left the scene, while the other passenger waited for the tow truck with the officer. While waiting, the officer noticed a short-barreled shotgun under the front seat of the car. The officer handcuffed the passenger and radioed another officer to find Pounds and the driver and bring them back to the scene. The officer located them in a restaurant and ordered them to the ground at gunpoint. They were then frisked, handcuffed, and transported back to the scene of the traffic stop where, in response to police questioning without Miranda warnings,[1] Pounds admitted the shotgun was his. Id.
¶20. In a Miranda analysis, we concluded Pounds was subjected to a degree of restraint associated with formal arrest that required Miranda protections. Pounds, 176 Wis. 2d at 322. However, we alluded to the fact that Pounds was nevertheless subject to a Terry stop.[2] We stated:
We do not quarrel with the state's assertion that the officers involved engaged in good investigative police work. [The officer] had the right to protect himself by ordering Brown and [the driver] to the ground at gunpoint. He had the right to frisk the men. He had the right to handcuff them, and to transport them in his patrol car back to the scene of the initial traffic stop.
... We disagree with the trial court's implicit assumption that Miranda is never implicated in the context of a Terry stop.
Pounds, 176 Wis. 2d at 322.
¶21. Putting these cases together, the State argues that neither directing Dubose to the ground at gunpoint, nor handcuffing him, nor placing him in the back of a squad car for only ten minutes would lead a reasonable person to believe he or she was under arrest. We are not persuaded.
¶22. We agree that Pounds approved using firearms to direct someone to the ground under the facts of the case, that both Pounds and Wilkins held that handcuffs do not necessarily transform a stop into an arrest, and that the length of the detention in Wilkins, anywhere from an hour to an hour and twenty minutes, is significantly longer than what occurred here, ten minutes. If that were all that occurred in this case, we may agree that Dubose was subject to an investigatory detention. However, the difficulty here is that the State cannot justify the officer's actions in searching-again, not frisking-Dubose's person, aside from pointing out that the search was fruitless. The fact that the search did not return any incriminating evidence, however, cannot obscure the fact that a reasonable person would correlate a search of his or her person to be associated with being in custody. On this ground, Wilkins and Pounds are not controlling here.
¶23. Given that Dubose was directed to the ground at gunpoint after being discovered, handcuffed,[3] searched, and then placed in the backseat of a squad car for ten minutes, we agree with the trial court that Dubose was placed under arrest.

B. Probable Cause
¶24. The next issue is whether there was probable cause for the arrest. Dubose argues the evidence, at best, supports nothing more than a reasonable suspicion justifying further investigation. We disagree.
¶25. Probable cause is that quantum of evidence that would lead a reasonable police officer to believe that the defendant probably committed a crime. State v. Ritchie, 2000 WI App 136, ¶8, 237 Wis. 2d 664, 614 N.W.2d 837. "There must be more than a possibility or suspicion that defendant committed an offense, but the evidence need not reach the level of proof beyond a reasonable doubt or even that guilt is more likely than not." Id. Probable cause determinations must be made on a case-by-case basis, looking at the totality of the circumstances. State v. Multaler, 2002 WI 35, ¶34, 252 Wis. 2d 54, 643 N.W.2d 437.
¶26. Based upon the totality of the circumstances, we conclude there was probable cause. First, the entirety of the events occurred in the early morning hours when there were few people out on the streets. See State v. Flynn, 92 Wis. 2d 427, 447, 285 N.W.2d 710 (1979) (time of day is a relevant factor). Second, Engelbrecht noticed two people in the very near vicinity of the burglary call, about a block and a half away, shortly after the call was made. Third, because one of the individuals wore a flannel shirt with a hood, they matched the description given in connection with the burglary call. Fourth, the then suspects ran away from Engelbrecht after he turned his vehicle in their direction. See Illinois v. Wardlow, 528 U.S. 119, 124-25 (2000) (flight from the police, although not dispositive, can be a relevant factor). Fifth, within a minute and a half, Engelbrecht set up a one-block perimeter to lock-down the area. Sixth, while waiting for the canine unit to arrive, Engelbrecht heard a dispatch regarding an armed robbery involving two African-American male suspects. Dispatch further advised this call may be related to the earlier burglary call. Seventh, Rocky, the canine partner, immediately picked up the scent of the suspects who ran away from Engelbrecht and ultimately tracked Dubose to a location that was within the officers' one-block perimeter. Eighth, Dubose was hiding in someone's backyard behind a fence. Ninth, after being told to come out, Dubose, an African-American male, appeared and fit the description from the armed robbery dispatch. The sum total of these events constitutes probable cause.
¶27. Because we conclude there was probable cause to arrest Dubose, Hiltsley's subsequent identifications are not the fruit of an unlawful government act. See Walker, 154 Wis. 2d at 185-86.

II. Suppression Based on Impermissible Suggestiveness
¶28. Alternatively, Dubose argues that the identification evidence should not have been admitted because the out-of-court showups were impermissibly suggestive. A criminal defendant is denied due process if identification evidence presented at trial stems from pretrial police procedure that is so impermissibly suggestive that it creates a "very substantial likelihood of irreparable misidentification." State v. Wolverton, 193 Wis. 2d 234, 264, 533 N.W.2d 167 (1995). The defendant has the burden to prove suggestiveness based upon the totality of the circumstances. Id.; see State v. Kaelin, 196 Wis. 2d 1, 10, 538 N.W.2d 538 (Ct. App. 1995).
¶29. As to the first identification that occurred while Dubose and Hiltsley were in separate squad cars, Dubose weaves the following four events together to claim impermissible suggestiveness: (1) he was sitting alone in the backseat of a police car; (2) Hiltsley was "buzzed"; (3) the identification occurred shortly after the armed robbery occurred while Hiltsley was upset from the ordeal; (4) the officers suggested they may have caught "one of the guys." We conclude Dubose has not met his burden.
¶30. First, Dubose concedes that sitting alone in a police car is insufficient to demonstrate a showup was impermissibly suggestive. See Wolverton, 193 Wis. 2d at 265.
¶31. Second, Dubose has not provided any authority to justify placing the identifier's condition, in and of itself, at issue as it relates to determining whether the police procedure creates impermissible suggestiveness. We agree with Dubose that we are to look to the totality of the circumstances to determine whether a showup was suggestive, see Kaelin, 196 Wis. 2d at 10, and that the identifier's condition at the time of the identification relates to the reliability of the identification. But we are not persuaded that for purposes of proving a constitutional violation the identifier's condition, wholly divorced from procedures used by the police, is relevant to proving that a showup was impermissibly suggestive.
¶32. Third, the supreme court has held that the closer in time an identification occurs to the commission of the crime, the greater the identification's integrity is. State v. DiMaggio, 49 Wis. 2d 565, 586, 182 N.W.2d 466 (1971). The court stated, "We believe that prompt identification, or lack of identification, promotes justice for victim and suspect. An immediate confrontation is inherently more reliable than a delayed one, while failure to identify terminates any inconvenience to the suspect." Id.; see also Johnson v. State, 47 Wis. 2d 13, 18, 176 N.W.2d 332 (1970) (identification proximate to the time of the offense promotes fairness by assuring reliability).
¶33. Finally, Dubose has not provided any authority to support the position that an identification is impermissibly suggestive when police officers tell a victim they "may have one of the guys." Moreover, we see nothing wrong with a police procedure where officers indicate an individual is a possible suspect. Even if this contains some suggestiveness, it certainly does not rise to the level of impermissible suggestiveness. Therefore, we conclude Dubose has not proved the first identification was impermissibly suggestive.
¶34. As to the second identification that occurred at the police station, Dubose protests that he was the only individual shown to Hiltsley. Again, the fact that Dubose was the only suspect shown to Hiltsley does not, of itself, render a showup impermissibly suggestive. See Wolverton, 193 Wis. 2d at 265. "To hold otherwise would be tantamount to holding that all showups are impermissibly suggestive, which would run counter to our prior decisions stating that showups are not per se impermissibly suggestive." Id.
¶35. Dubose also objects to the proximity of this showup with the first identification, which occurred just fifteen minutes earlier. Dubose claims this short time span did not allow for a separate and independent identification, but rather merely allowed the witness to confirm the earlier mistaken identification. We reject this argument for two reasons.
¶36. First, to the extent that Dubose claims this second identification was premised on an earlier mistaken identification, we note that our inquiry rests solely on the suggestiveness of the police procedures used in garnering an individual's identification and whether those procedures create impermissible suggestiveness. Therefore, Dubose's contention that the second identification allowed Hiltsley to confirm an earlier mistake misses the point.
¶37. Second, Dubose has not provided any authority to support his assumption that a subsequent identification must occur after a period of time has lapsed to ensure the identification is separate and independent, thereby preventing impermissible suggestiveness. In reality, Dubose's argument relates only to the reliability of the identification. Without there being any impermissible suggestiveness in the second showup, the reliability of the identification is immaterial for our purposes of considering whether a defendant's due process rights have been violated.
By the Court.Judgment affirmed.
NOTES
[1] See Miranda v. Arizona, 384 U.S. 436 (1966).
[2] Terry v. Ohio, 392 U.S. 1 (1968).
[3] The testimony from the suppression hearing on this point is unclear. Engelbrecht testified that after Dubose was located, Engelbrecht directed him to the ground and "placed him in custody." We take this as meaning he placed Dubose in handcuffs while Dubose was on the ground. This supposition is supported by the fact that Engelbrecht testified that after he searched Dubose, he double-locked the handcuffs before placing Dubose in the back of a squad car.