# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2017AP1894-CR |
| COMPLETE TITLE: | State of Wisconsin, <br>          Plaintiff-Appellant, <br>     v. <br> Stephan I. Roberson, <br>          Defendant-Respondent-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 384 Wis. 2d 632,922 N.W.2d 317
(2018 – unpublished)

| | |
|---|---|
| OPINION FILED: | December 3, 2019 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 6, 2019 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|    COURT: | Circuit |
|    COUNTY: | Wood |
|    JUDGE: | Nicholas J. Brazeau Jr. |

| | |
|---|---|
| JUSTICES: | |
|    CONCURRED: | R.G. BRADLEY, J. concurs (except for ¶¶41-42), joined by KELLY, J. (opinion filed) <br> HAGEDORN, J. concurs. (opinion filed) |
|    DISSENTED: | |
|    NOT PARTICIPATING: | DALLET, J. dissents, joined by A.W. BRADLEY, J. (opinion filed) |

ATTORNEYS:

For the defendant-respondent-petitioner, there were briefs filed by *Suzanne Edwards* and the *Law Office of Suzanne Edwards*, Dodgeville. There was an oral argument by *Suzanne Edwards.*

For the plaintiff-appellant, there was a brief filed by *Donald V. Latorraca*, assistant attorney generals, with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Donald V. Latorraca*.

An amicus curiae brief was filed on behalf of The Innocence Project, Inc., and the Wisconsin Innocence Project by *Keith A.*

*Findley* and *Wisconsin Innocence Project*; with whom on the brief is *Sarah K. Grossnickle* and *Whitney Wester,* Houston, Texas, and *Alyssa Musante,* Los Angeles, California.

**2019 WI 102**

No. 2017AP1894-CR
(L.C. No. 2017CF76)

STATE OF WISCONSIN        :        IN SUPREME COURT

**State of Wisconsin,**

      **Plaintiff-Appellant,**

  **v.**

**Stephan I. Roberson,**

      **Defendant-Respondent-Petitioner.**

---

REVIEW of a decision of the Court of Appeals.   *Affirmed.*

¶1 PATIENCE DRAKE ROGGENSACK, C.J. We review an unpublished decision of the court of appeals[1] reversing the circuit court's[2] suppression of the victim's identification of Stephan I. Roberson because the identification began with law enforcement showing a single Facebook photo to the victim.

---

[1] State v. Roberson, No. 2017AP1894-CR, unpublished slip op. (Wis. Ct. App. Oct. 4, 2018) (per curiam).

[2] The Honorable Nicholas J. Brazeau, Jr. of Wood County presided.

¶2 Roberson argues that the circuit court correctly granted his motion to suppress the identification evidence on the ground that the police utilized an unnecessarily suggestive procedure, which violated his due process rights under Article I, Section 8 of the Wisconsin Constitution as explained in State v. Dubose, 2005 WI 126, 285 Wis. 2d 143, 699 N.W.2d 582.

¶3 The State urges us to overturn Dubose, and return to our past practice of following decisions of the United States Supreme Court in regard to criteria that are necessary to accord due process in eyewitness identifications. We agree with the State. Dubose was unsound in principle. Therefore, we overturn Dubose and return to "reliability [a]s the linchpin in determining the admissibility of identification testimony." Manson v. Brathwaite, 432 U.S. 98, 114 (1977); see also Neil v. Biggers, 409 U.S. 188, 199 (1972). Due process does not require the suppression of evidence with sufficient "indicia of reliability." Perry v. New Hampshire, 565 U.S. 228, 232 (2012).

¶4 Accordingly, "a criminal defendant bears the initial burden of demonstrating that a showup was impermissibly suggestive." State v. Wolverton, 193 Wis. 2d 234, 264, 533 N.W.2d 167 (1995) (citing State v. Mosley, 102 Wis. 2d 636, 652 307 N.W.2d 200 (1981) and Powell v. State, 86 Wis. 2d 51, 65, 271 N.W.2d 610 (1978)). If a defendant meets this burden, the State must prove that "under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." Wolverton, 193 Wis. 2d at 264 (quoting Brathwaite, 432 U.S. at 106 and citing Biggers, 409

U.S. at 199). We conclude that the State has satisfied its burden here.

¶5 Therefore, we affirm the court of appeals and remand to the circuit court for proceedings consistent with this opinion.

## I. BACKGROUND

¶6 The State charged Roberson with first-degree reckless injury, contrary to Wis. Stat. § 940.23(1)(a) (2017–18).[3] The charge stemmed from an incident where Roberson, allegedly, shot C.A.S. over a drug deal that went wrong.

¶7 C.A.S., a Caucasian male, claims to have met an African American male at a Walmart toward the end of January in 2017. At that time, C.A.S. knew him only as "P." P tapped C.A.S. on the shoulder and asked C.A.S. if he "smoked." After C.A.S. responded "yeah," P asked C.A.S. to obtain a "bag" of marijuana for him. C.A.S. indicated he could. The two drove to get marijuana and then drove back to Walmart and exchanged numbers. This first encounter lasted approximately a half an hour.

¶8 The following day, C.A.S. was supposed to bring P more marijuana. For whatever reason, C.A.S. was unable to secure any, and C.A.S. contacted P explaining his failure.

¶9 The next day, C.A.S. texted P to tell him he could get marijuana. The two arranged for P to pick up C.A.S. after P

---

[3] All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

finished work. Sometime after 7:00 p.m., P picked up C.A.S. and C.A.S.'s brother and sister, and the four drove to secure the marijuana. The group then drove back to C.A.S.'s residence. P came inside the house, where he asked C.A.S. to sell the marijuana for him. C.A.S. agreed. This second encounter lasted approximately a half an hour.

¶10 P instructed C.A.S. to sell the marijuana in "eighths," meaning an eighth of an ounce at a time. However, C.A.S. had a potential buyer, who was interested in a half an ounce, worth approximately $180. C.A.S. went to sell the half an ounce, and the potential buyer robbed him at gunpoint. C.A.S. texted P, explaining what happened. A few minutes later, P picked up C.A.S., who had been walking on the road.

¶11 The two drove to a dog park where the situation escalated. P took out a gun and fired a shot past C.A.S.'s head. C.A.S. punched P in the face, and then P pointed his gun at C.A.S. and shot him in his leg. P yelled, "Why'd you make me shoot you?" P then asked C.A.S. if he was going to tell anyone. C.A.S. said no and asked P to drive him home. P drove C.A.S. to the residence of D.D., a friend of C.A.S. When C.A.S. got there, he used two belts to create a makeshift tourniquet. He then "got high." This third encounter lasted between an hour and a half and two hours. C.A.S. did not contact law enforcement because he was subject to an outstanding warrant.

¶12 C.A.S. spent between two and a half to three hours with P over a short period of time. The evidence does not

4

indicate that at any point during the encounters C.A.S.'s mental state was impaired by drugs or alcohol.

¶13 Investigator Nathan Reblin learned that C.A.S. had been injured and was cared for at D.D.'s residence. He began trying to locate C.A.S. A confidential citizen witness gave Reblin a cell phone that P had given to C.A.S., apparently so the two could communicate. C.A.S. was logged into the cell phone's Facebook app. The cell phone had text messages between C.A.S. and a person identified in the messages as "P." Reblin noted the phone number of the contact and searched for it on Facebook. The search yielded one result: a profile for Roberson.

¶14 Law enforcement obtained a warrant to search D.D.'s residence. They found what they believed to be blood on some boxer shorts. They also found a chair in the basement and a quilt that both appeared to have blood stains. They did not find C.A.S.

¶15 Later, C.A.S. was taken into custody on a probation hold. However, before he was taken to the Wood County jail, he was taken to a hospital for what appeared to be an old gunshot wound to his leg.

¶16 About two weeks after the shooting, Reblin and his partner interviewed C.A.S. at the jail. The interview was videotaped, and the circuit court admitted a DVD of the interview into evidence.

¶17 C.A.S. told Reblin and his partner what transpired. Reblin asked C.A.S. if he would be able to identify P from a

photograph. He responded, "Possibly, I mean, I don't know, black people kinda" and made a shaking movement with his right hand that indicated uncertainty. Reblin's partner brought up a photograph of Roberson from Facebook on his phone, which he showed to C.A.S. who immediately began nodding his head up and down. After the non-verbal indication that the photograph was P, Reblin asked, "That's him?" C.A.S. responded, "yup." Reblin then asked, "100%?" C.A.S. replied, "100% yeah."

¶18 Subsequently, Roberson moved to suppress C.A.S.'s out-of-court identification on the ground that the investigators used a single photograph as opposed to a photograph array. At the suppression hearing, C.A.S. testified that P looked similar on all three occasions. He had either "dreadlocks" or "cornrows" and had on a sweatshirt with work pants.

¶19 The circuit court generally noted the same historical facts as are set out above. In particular, the circuit court said:

> [C.A.S.] is clearly unsure of the characteristics of African Americans. He states the same. Objectively, it is hard to convince ones self that [C.A.S.] wouldn't have identified any picture of an African American male as "P" if Reblin indicated that it was a picture of "P." The process is shaky, and the victim making the identification is likewise shaky, so the [c]ourt lacks confidence that the identification of "P" by [C.A.S.] is not a result of showing the single photo to him. As such, [C.A.S.]'s identification of the defendant's photo and his later identification in court, tainted by his exposure to that photo, are suppressed.

¶20 Although C.A.S. made a comment and a gesture indicating that he was unsure about identifying African American

6

people, the circuit court noted that, "The chances that a misidentification occurred are unclear."  The circuit court also said, "This [c]ourt believes [C.A.S.] has a sufficient basis to identify 'P' from those meetings."

¶21 Nevertheless, the circuit court granted Roberson's motion to suppress and also held that C.A.S. could not identify Roberson in court because the initial identification tainted any subsequent identification.

¶22 The State filed an interlocutory appeal, arguing the circuit court improperly suppressed the out-of-court identification and that even if the out-of-court identification was improper, the circuit court erroneously used that as a basis for excluding a subsequent in-court identification.  The court of appeals reversed the circuit court.  State v. Roberson, No. 2017AP1894-CR, unpublished slip op. (Wis. Ct. App. Oct. 4, 2018) (per curiam).  The court of appeals reasoned that a single photograph is not a showup and that any decision to extend Dubose must be left to this court.  Id., ¶¶10-17.

¶23 We granted Roberson's petition for review and now affirm the court of appeals, albeit on different grounds.

## II.  DISCUSSION

### A.  Identification Due Process

¶24 We are asked to return to our pre-Dubose standards for pretrial identifications.  Accordingly, a review of our pre-Dubose identification decisions may be helpful to the reader before we begin to discuss Dubose.

¶25 Generally, the admissibility of evidence in state court trials is governed by the rules of evidence. See, e.g., Wis. Stat. § 904.03. Once admitted, the jury determines which evidence is credible and what weight to ascribe to it. State v. Hibl, 2006 WI 52, ¶31, 290 Wis. 2d 595, 714 N.W.2d 194; see also State v. Johnson, 2004 WI 94, ¶20, 273 Wis. 2d 626, 681 N.W.2d 901 (instructing that it is for the jury to assess the credibility of witnesses).

¶26 However, due process also may restrict admission of eyewitness testimony: "identification [evidence] infected by improper police influence" may be excluded when "there is 'a very substantial likelihood of irreparable misidentification'" unless, "the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances." Perry, 565 U.S. at 232.

¶27 Under its due process analysis, the United States Supreme Court places the burden first on the defendant to show that the method law enforcement chose to employ to identify a suspect as the perpetrator was "an unnecessarily suggestive identification procedure," such that there was a very substantial likelihood of misidentification.[4] Id. at 232 n.1,

---

[4] We note that this first step is not controversial. Justice Sonia Sotomayor, in dissent with her colleagues in Perry, explained, "the defendant has the burden of showing that the eyewitness identification was derived through 'impermissibly suggestive' means." Perry v. New Hampshire, 565 U.S. 228, 253-54 (2012) (Sotomayor, J., dissenting) (citing Simmons v. United States, 390 U.S. 377, 384 (1968)).

(continued)

8

235. Only after a court concludes that the defendant has met his or her burden in this regard will the court extend a pretrial screening for reliability; otherwise, reliability of admissible evidence is for the jury to determine in the first instance.[5] Id. at 232 & n.1.

¶28 Perry's discussion of "unnecessarily" is focused on police conduct that is claimed to have "manufactured" a challenged identification procedure when identification may have been obtained by a less suggestive means. Id. at 235. Perry explains that "due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." Id. at 238-39 (citing Brathwaite, 432 U.S. at 107, 109). Under the federal standard, as Justice Sonia Sotomayor explained in her dissent, "[m]ost identifications will be admissible." Perry, 565 U.S. at 254 (Sotomayor, J., dissenting). That is so because reliability is the decisive issue under the federal due process standard.

¶29 Due process focuses on ensuring reliable identification evidence. Accordingly, when unnecessarily

---

Unnecessarily suggestive and impermissibly suggestive seem to be used interchangeably by the United States Supreme Court at times. See Perry, 565 U.S. at 254 n.3 (Sotomayor, J., dissenting); Neil v. Biggers, 409 U.S. 188, 197-98 (1972).

[5] Dubose placed the burden on the State of proving the necessity of the procedure chosen. Therefore, under Dubose, if the State cannot prove the chosen procedure was necessary, the entire analysis stops, and the court never considers whether the evidence is reliable. It is simply excluded. State v. Dubose, 2005 WI 126, ¶33, 285 Wis. 2d 143, 699 N.W.2d 582.

suggestive state action occurs, the State bears the burden to provide a factual foundation that supports the reliability of the evidence. Necessity can become a factor when identification is challenged; however, if a suggestive law enforcement procedure was necessary, the state action that resulted in an identification will not implicate due process concerns. Id. at 242 (majority opinion). As Perry explained, "The fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness." Id. at 245.

¶30 Even before Perry, we followed a similar two-step due process analysis. Wolverton, 193 Wis. 2d at 264. Perry assists in sharpening that analysis today.

¶31 In Wolverton, the defendant moved to suppress his pretrial identification that resulted from two showups. Id. at 243. The showups occurred when Wolverton was sitting alone in the back seat of a squad car. Id. at 249. Upon Wolverton's motion to suppress his identification, we reviewed the requirements of due process in regard to identification evidence. Id. at 264. We explained that a "pretrial police procedure that is 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification'" violates due process. Id. (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)).

¶32 We concluded that showups were "not per se impermissibly suggestive." Wolverton, 193 Wis. 2d at 264

10

(citing State v. Streich, 87 Wis. 2d 209, 214, 274 N.W.2d 635 (1979) and State v. Isham, 70 Wis. 2d 718, 725, 235 N.W.2d 506 (1975)). We said that "a criminal defendant bears the initial burden of demonstrating that a showup was impermissibly suggestive." Wolverton, 193 Wis. 2d at 264 (citing Mosley, 102 Wis. 2d at 652 and Powell, 86 Wis. 2d at 65). If a defendant meets this burden, then the State must prove that "under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." Wolverton, 193 Wis. 2d at 264 (quoting Brathwaite, 432 U.S. at 106).

¶33 Wolverton cites the Sixth and Fourteenth Amendments of the United States Constitution when addressing the right to counsel and due process. Wolverton, 193 Wis. 2d at 251 n.6, 7. We did not specify the source of the due process right that protects a defendant from unreliable identifications. However, the cases upon which we relied in that regard are grounded in the Fourteenth Amendment. E.g., Streich, 87 Wis. 2d at 214-15; Brathwaite 432 U.S. at 99. Furthermore, in Mosley, while recognizing that we could go beyond the guarantees of the Fourteenth Amendment, we specifically declined to do so. Mosley, 102 Wis. 2d at 667-68 (explaining that "we decline the defendant's invitation to go beyond the federal constitutional holding and reach a contrary result based on independent state constitutional grounds.").

¶34 Until our decision in Dubose, we continued to use this two-step process when evaluating motions to suppress pretrial

11

identifications. First, the defendant must meet an initial burden of showing that the identification procedure employed by law enforcement was impermissibly suggestive such that there was a very substantial likelihood of misidentification. Perry, 565 U.S. at 232; Wolverton, 193 Wis. 2d at 264.

¶35 Second, if the defendant meets that burden and the burden shifts to the State, the State must prove that "under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." Brathwaite, 432 U.S. at 106 (quoting Biggers, 409 U.S. at 199). A nonexclusive list of reliability factors includes: (1) the opportunity of the witness to view the suspect at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of his prior description of the suspect, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation. Brathwaite, 432 U.S. at 114.

¶36 An additional factor that may be considered is the extent to which the procedure was documented, such as by video recording. See Howard B. Eisenberg & Bruce G. Feustal, Criminal Law: Pretrial Identification: An Attempt to Articulate Constitutional Criteria, 58 Marq. L. Rev. 659, 683 (1975) (recommending videotaping lineups).

¶37 Dubose departed from the Brathwaite/Biggers analysis, and instead, it fashioned a rule based on social science research. However, social science research cannot be used to

define the meaning of a constitutional provision. As Justice Antonin Scalia famously stated:

> The principal theoretical defect of nonoriginalism, in my view, is its incompatibility with the very principle that legitimizes judicial review of constitutionality. . . . [T]he Constitution, though it has an effect superior to other laws, is in its nature the sort of "law" that is the business of the courts——an enactment that has a fixed meaning ascertainable through the usual devices familiar to those learned in the law. If the Constitution were not that sort of a "law," but a novel invitation to apply current societal values, what reason would there be to believe that the invitation was addressed to the courts rather than to the legislature? One simply cannot say, regarding that sort of novel enactment, that "[i]t is emphatically the province and duty of the judicial department" to determine its content. Quite to the contrary, the legislature would seem a much more appropriate expositor of social values, and its determination that a statute is compatible with the Constitution should, as in England, prevail.

Antonin Scalia, Originalism: The Lesser Evil, 57 U. Cin. L. Rev. 849, 854 (1989).

¶38 As Justice Scalia explained, the judiciary is not in a good position to judge social values or social science. When social science is disputed, the institutional parameters of the judiciary are amplified. It is the legislature that is structured to assess the merits of competing policies and ever-changing social science assertions.

¶39 It is no surprise that, with mounds of research available, the State in the dispute now before us has identified social science that supports its position. E.g., John Wixted & Gary Wells, The Relationship Between Eyewitness Confidence and

Identification Accuracy: A New Synthesis, 18 Psychol. Sci. in the Pub. Int. 10 (2017).

¶40 Furthermore, categorical rules of exclusion, based on social science, are the antithesis of justice because "one of the major tenets in the administration of justice" is "the presentation of reliable, relevant evidence at trial." Dubose, 285 Wis. 2d 143, ¶86 (Roggensack, J., dissenting) (citing Brathwaite, 432 U.S. at 112).

¶41 Historically, there have been times when social science has been used by courts as an excuse to justify disturbing decisions. Indeed, entire law review articles and book chapters have been dedicated to analyzing how Plessy v. Ferguson and the line of cases that followed Plessy grounded their decisions in social science of the time. E.g., Herbert Hovenkamp, Social Science and Segregation Before Brown, 1985 Duke L.J. 624. As explained:

> [P]olicy-based adjudication was as prevalent in the race cases of the Gilded Age and the Progressive Era as in any area of law during the time. However, the policies were different from those espoused by liberal social scientists after the New Deal. According to the prevailing social science of the 1910's and 1920's, the social value created by a comprehensive, state-enforced plan of racial separation was far greater than any costs imposed on its victims. . . . [T]he law of race relations during this period was a product of the period's social science, just as the law of race relations developed by the Warren Court during the Brown era was a product of the social science of that period.

Id. at 627.

¶42 The United States Supreme Court cited social science in Brown, but it did so as a response to social science employed at the time of Plessy. Brown v. Board of Educ., 347 U.S. 483, 494 n.11 (1954). The research at the time of Brown showed:

> Segregation of white and colored children in public schools has a detrimental effect upon colored children. The impact is greater when it has the sanction of the law for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group.

Id. at 494. The Court stated, "[w]hatever may have been the extent of psychological knowledge at the time of Plessy v. Ferguson, this finding [of negative psychological impact] is amply supported by modern authority." Id.

¶43 Social science often embodies the subjective beliefs of the time. When these beliefs become enshrined as constitutional law, they have a long-lasting impact even if proved incorrect at a later date. The contrast between Plessy and Brown is a telling example. Plessy embodied abhorrent social beliefs regarding the superiority and inferiority of people based on race. This belief then became law through United States Supreme Court decision-making that was purporting to interpret the United States Constitution. It took more than half a century to correct course because it is difficult to overturn constitutional precedent.

¶44 Social science cannot change the original meaning of the Wisconsin Constitution, any more than it can change the meaning of the United States Constitution. Article I, Section 8 of the Wisconsin Constitution protects a defendant's right to

15

due process, just as the federal constitution's Fourteenth Amendment does. Due process requires that evidence infected by improper police conduct from which there is a substantial likelihood of misidentification will be excluded unless the State proves that under the totality of circumstances bearing on the identification, it is nonetheless reliable. Perry, 565 U.S. at 232. Due process does not require that all showups be excluded. Id. Rather, the question is whether the particular showup under consideration is reliable. Id. We note that the United States Supreme Court agrees, as the Court has explicitly held, reliability must be determined on a "case-by-case" basis. Id. at 239 (citing Biggers, 409 U.S. at 201).

¶45 Wisconsin court procedure used to evaluate showup identifications changed substantially under Dubose. As we are asked to overturn Dubose, we now turn our attention to that decision and the rationales that supported or opposed it.

### B. Dubose

¶46 We begin by noting that in order to reach its conclusion that suppressing out-of-court identifications obtained by law enforcement through an unnecessary procedure was required, Dubose overruled Wisconsin appellate precedent that had stood for at least 26 years. Dubose, 285 Wis. 2d 143, ¶33 n.9 withdrawing language from Wolverton, 193 Wis. 2d at 258, Streich, 87 Wis. 2d 209 and State v. Kaelin, 196 Wis. 2d 1, 538 N.W.2d 538 (Ct. App. 1995)). As we explain below, Dubose is unsound in principle as it was based on misunderstanding the

16

United States Supreme Court's decisions in regard to out-of-court identifications and on topical social science.

¶47 Dubose defined a showup as "an out-of-court pretrial identification procedure in which a suspect is presented singly to a witness for identification purposes." Dubose, 285 Wis. 2d 143, ¶1 n.1 (quoting Wolverton, 193 Wis. 2d at 263 n.21). We have no quarrel with that definition. Here, the suspect, Roberson, was presented via a single photograph as opposed to being presented singly in person as the suspect was in Dubose.

¶48 We conclude that the State action that caused a showup to be subject to constitutional scrutiny in Dubose may be equally applicable to the use of a single Facebook photo for an out-of-court identification. Therefore, we address the continued validity of Dubose, even though the identification employed here was not a single person showup.

¶49 We are respectful of the doctrine of stare decisis. State v. Luedtke, 2015 WI 42, ¶40, 362 Wis. 2d 1, 863 N.W.2d 592. As we have previously explained:

> [Adhering to precedent] ensures that existing law will not be abandoned lightly. When existing law is open to revision in every case, deciding cases becomes a mere exercise of judicial will, with arbitrary and unpredictable results. Consequently, this court has held that any departure from the doctrine of stare decisis demands special justification.

Schultz v. Natwick, 2002 WI 125, ¶37, 257 Wis. 2d 19, 653 N.W.2d 266 (citations and quotations omitted). On the other hand, we acknowledge that "[w]e do more damage to the rule of law by obstinately refusing to admit errors, thereby perpetuating

17

injustice, than by overturning an erroneous decision." Johnson Controls, Inc. v. Emp'rs Ins. of Wausau, 2003 WI 108, ¶100, 264 Wis. 2d 60, 665 N.W.2d 257.

¶50 When we are requested to overturn precedent, we consider whether one or more of the following circumstances is present:

> (1) Changes or developments in the law have undermined the rationale behind a decision; (2) there is a need to make a decision correspond to newly ascertained facts; (3) there is a showing that the precedent has become detrimental to coherence and consistency in the law; (4) the prior decision is "unsound in principle;" or (5) the prior decision is "unworkable in practice."

Bartholomew v. Wis. Patients Comp. Fund & Compcare Health Servs. Ins. Corp., 2006 WI 91, ¶33, 293 Wis. 2d 38, 717 N.W.2d 216. We also may consider "whether [our past decision] has produced a settled body of law." Id., ¶34 (quoting Johnson Controls, 264 Wis. 2d 60, ¶99).

¶51 A decision is unsound in principle when it relies on an erroneous understanding of United States Supreme Court decisions or misapplies the Wisconsin Constitution because the misunderstanding and faulty application "risk[] perpetuating erroneous declarations of the law." See Tetra Tech EC, Inc. v. DOR, 2018 WI 75, ¶83, 382 Wis. 2d 496, 914 N.W.2d 21 (quoting Operton v. LIRC, 2017 WI 46, 274 Wis. 2d 1, ¶73, 894 N.W.2d 426 (R. Bradley, J., concurring). Dubose misunderstood United States Supreme Court decisions and misapplied Article I, Section 8 of the Wisconsin Constitution when it concluded that evidence obtained from an out-of-court showup "will not be admissible

18

unless, based on the totality of the circumstances, the procedure was necessary." Dubose, 285 Wis. 2d 143, ¶¶33, 45.

¶52 That Dubose misunderstood United State Supreme Court's decisions is apparent from Dubose's discussion of Stovall v. Denno, 388 U.S. 293 (1967) where Dubose reasoned:

> [W]e adopt standards for the admissibility of out-of-court identification evidence similar to those set forth in the United States Supreme Court's decision in Stovall. We hold that evidence obtained from such a showup will not be admissible unless, based on the totality of the circumstances, the showup was necessary.

Dubose, 285 Wis. 2d 143, ¶45; (see also ¶33, for a similar statement).

¶53 Stovall arose upon the United States Supreme Court's consideration of whether to retroactively apply a Supreme Court holding that required "exclusion of identification evidence which is tainted by exhibiting the accused to identifying witnesses before trial in the absence of his counsel." Stovall, 388 U.S. at 294. Stovall never concluded that identification evidence must be excluded unless the showup "was necessary." Instead, it held, "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it." Id. at 302. Reliability of the factfinding process remained the dispositive criterion for admissibility of in-person identifications in Stovall. Id. at 298.

¶54 In addition, there was no need, and Dubose provided no logical rationale, for departing from our past reliance on the

19

United States Supreme Court's interpretation of due process requirements under the federal constitution when out-of-court identifications are challenged in Wisconsin courts.[6] <u>Simos v. State</u>, 83 Wis. 2d 251, 258, 265 N.W.2d 278 (1978), which relied on United States Supreme Court precedent to conclude that under the totality of circumstances the identification was reliable, and <u>Streich</u>, 87 Wis. 2d at 214-15, which followed the United States Supreme Court's lead on due process with regard to avoiding misidentification in a showup, are but two examples.

¶55 As Justice Jon P. Wilcox explained:

> Today the majority alters course and abandons . . . [a] long line of well-established precedent, contending that the Due Process Clause of the Wisconsin Constitution now affords greater protections than its federal counterpart. . . .
>
> Given the nearly identical language in the two provisions and this court's historic practice of interpreting the two provisions in the same fashion, the majority simply has no support for its conclusion that the language in Article I, Section 8 "necessitates" a rejection of . . . [United States Supreme Court decisions]."

<u>Dubose</u>, 285 Wis. 2d 143, ¶¶61-62 (Wilcox, J., dissenting).

---

[6] United States Supreme Court precedent relative to allegedly unfair pretrial identifications relies on the Fourteenth Amendment. <u>Perry</u>, 565 U.S. at 237 (citing <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959)).

The Fourteenth Amendment provides in relevant part, "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

¶56 Certainly, states have the power to afford greater protection to citizens under their constitutions than the federal constitution does. Herb v. Pitcairn, 324 U.S. 117, 125 (1945) (explaining that federal courts will refuse to review a state court decision if the decision is based on an "adequate and independent state ground[]"). However, the question for a state court is whether its state constitution actually affords greater protection. A state court does not have the power to write into its state constitution additional protection that is not supported by its text or historical meaning.

¶57 As Justice David T. Prosser cautioned, "While the court may exercise this power, the court should pay more attention to whether it should exercise this power." Dubose, 285 Wis. 2d 143, ¶75 (Prosser, J., dissenting). In particular, we must recognize that "[b]y sheer volume of cases, the [United States] Supreme Court has developed substantial experience interpreting constitutional provisions." Id., ¶76.

¶58 Furthermore, Dubose explicitly relied on case law from Massachusetts and New York when interpreting due process guarantees under Article I, Section 8 of the Wisconsin Constitution.[7] Id., ¶¶38, 42 (majority opinion) (citing Commonwealth v. Johnson, 650 N.E.2d 1257, 1262, 1265 (Mass. 1995) (which rejected the reliability test for admissibility and

---

[7] Article I, Section 8 provides in relevant part, "No person may be held to answer for a criminal offense without due process of law." Wis. Const. art. I, § 8.

21

required per se exclusion for showup identifications based on due process protections of the Massachusetts Constitution); State v. Adams, 423 N.E.2d 379, 383 (N.Y. 1981) (which relied on the New York Constitution to conclude that excluding identification evidence from a showup does not deprive the prosecutor of reliable evidence)).

¶59 There is no logical nexus between how Massachusetts and New York courts interpret their individual constitutions, which contain constitutional provisions not found in Wisconsin's Constitution, and how we should interpret Wisconsin's Constitution.  And, of equal importance, Dubose provides no explanation on why the Wisconsin Constitution has a different due process guarantee than its federal counterpart.

¶60 Dubose crafted a rule of constitutional law, largely based on social science reports that it found persuasive. However, by defining a constitutional provision according to social science reports, Dubose created the capacity to prevent identifications of perpetrators of crimes when under the totality of circumstances surrounding the identifications, they were reliable.

¶61 Furthermore, Dubose has not created a substantial body of settled law.[8]  Rather, it created a specific rule that has not

---

[8] We are aware of states that mention Dubose, but none have decided to follow it.  For example, State v. Washington, 189 A.3d 43, 55–57 (R.I. 2018); State v. Herrera, 902 A.2d 177, 181 (N.J. 2006), overruled on other grounds by State v. Henderson, 27 A.3d 872 (N.J. 2011); State v. Ledbetter, 881 A.2d 290 (Conn. 2005) overruled on other grounds by State v. Harris, 191 A.3d

(continued)

22

been followed by appellate courts of other jurisdictions.  And finally, Dubose has been treated negatively by several subsequent Wisconsin appellate opinions.

¶62 For example, in 2006, shortly after Dubose was decided, "[w]e determine[d] that Dubose does not directly control cases involving identification evidence derived from 'accidental' confrontations resulting in 'spontaneous' identifications." Hibl, 290 Wis. 2d 595, ¶3.  We then remanded to the circuit court to apply the rules of evidence to the identification.  Id.  We noted that those rules allow circuit courts to use their discretion to exclude evidence when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Wis. Stat. § 904.03; Hibl, 290 Wis. 2d 595, ¶3.

¶63 In 2007, the court of appeals "conclude[d] that Dubose did not alter the standard for determining whether admission of an out-of-court identification from a photo array violates due

---

119 (Conn. 2018).  Though some state courts have permitted defendants more protection than afforded by the United States Constitution's guarantee of due process, and some have cited Dubose in so doing, none have conditioned admission of the out-of-court identification on whether the procedure that law enforcement employed was necessary.  For example in Henderson, the New Jersey Supreme Court adopted a reliability standard it believed was more accurate.  Henderson, 27 A.3d at 919-20.  In Harris, the Connecticut Supreme Court adopted the standard designed in Henderson.  Harris, 191 A.3d at 143.

process." State v. Drew, 2007 WI App 213, ¶2, 305 Wis. 2d 641, 740 N.W.2d 404.

¶64 In 2012, we held Dubose was inapplicable to an in-court, mugshot identification. State v. Ziegler, 2012 WI 73, ¶¶81–82, 342 Wis. 2d 256, 816 N.W.2d 238. We said that we saw "no reason to apply Dubose," and the defendant could point to none. Id., ¶82.

¶65 In 2015, we confirmed the limited reach of Dubose in Luedtke, 362 Wis. 2d 1, where we stated:

> [P]ost-Dubose, we have held that the decision did not create a precedential sea change with respect to the recognition of a broader due process protection under the Wisconsin Constitution than under the United States Constitution. In State v. Drew, the court of appeals held that Dubose did not alter precedent with respect to lineups and photo arrays, explaining that Dubose recognized those identification procedures are preferable to a showup. In State v. Hibl, we held that Dubose did not directly control spontaneous or accidental identifications of a defendant by a victim lacking police involvement. Finally, in State v. Ziegler, we distinguished a showup from an identification made in court through the showing of a single mug shot.
>
> The State correctly notes, even within the specific context of eyewitness identification, post-Dubose jurisprudence confirms the limited reach of its actual holding: that due process under the Wisconsin Constitution provides greater protection in one identification procedure, the showup.

Id., ¶¶49–50 (citations omitted). Given that Dubose has not created a substantial body of law, overturning it will have minimal impact. With the above review in mind, we conclude that stare decisis is not offended by overturning Dubose, and we now do so.

24

### C.   Standard of Review

¶66   We employ a two-step standard of review when analyzing a motion to suppress.  State v. Blatterman, 2015 WI 46, ¶16, 362 Wis. 2d 138, 864 N.W.2d 26.  We first review the circuit court's findings of historical fact, which we uphold unless they are clearly erroneous.  Id.   Next, we independently apply constitutional principles to the facts found, which presents a question of law.  Id.

### D.   C.A.S.'s Identification

¶67   We note that not all showings of a single photo are infected by improper police influence causing a very substantial likelihood of misidentification.  Each identification must be evaluated based on its own facts.  Perry, 565 U.S. at 239, 245 n.5.  C.A.S.'s identification began with the display of a color photo of Roberson's Facebook photo.

¶68   The first step in our evaluation is whether Roberson can prove that the method chosen by law enforcement was impermissibly suggestive.  While it is true that it would have been better practice for law enforcement to show Facebook photos of more than one African American male, the officer never asked if the picture was the man C.A.S. knew as P, even though he had asked if C.A.S. thought he could identify P.  Only after C.A.S. gave a nonverbal indication that he recognized the man in the Facebook photo, did Reblin ask "That's him?"  However, we will assume without deciding, that Roberson met his burden of proving

25

an impermissibly suggestive mode of identification, as did the court of appeals.[9] Roberson, No. 2017AP1894-CR, ¶18.

¶69 The burden now shifts to the State to prove that under the totality of the circumstances the identification was reliable. Biggers, 409 U.S. at 199. Applying the reliability assessment factors from Biggers, which were confirmed in Brathwaite 432 U.S. at 106-07, 114, to the facts herein, we note that C.A.S. had ample opportunity to view P. At a minimum, C.A.S. spent two and a half hours with P, on three separate occasions, over a short period of time. C.A.S. spent five times more time with P than the victim in Biggers did with her assailant, which the United States Supreme Court held was a "considerable period of time." Id. at 200. Nothing in the record suggests C.A.S. had an altered mental state or was otherwise cognitively impaired. Additionally, while P never

---

[9] The State has articulated a few reasons why the procedure might not have been impermissibly suggestive. First, it points out that the investigator used a photograph from Facebook as opposed to a mugshot. It argues, "[u]nlike a mugshot, which carries with it the implicit prejudicial suggestion that the person depicted has been arrested or convicted of a crime, . . . [the photograph in this case] does not convey this type of suggestibility." Resp. br. at 26. Second, the State relies heavily on a theory that "the protagonists are known to one another." Resp. br. at 27 (quoting People v. Gissendanner, 399 N.E.2d 924, 930 (N.Y. 1979)). Apparently, some support exists for the proposition that when two people are well-acquainted, an identification procedure cannot be suggestive. Resp. br. at 26-27.

provided his name, we note he made no substantial effort to conceal his identity.

¶70 The degree of attention favors reliability. C.A.S. agreed to participate in a drug-dealer relationship with P. P gave C.A.S. a phone, presumably so they could forward their plans. Their interactions show they were contemplating an ongoing relationship where it could be expected they would know each other's faces under circumstances similar to those present here. We also note that P came into C.A.S.'s residence, something generally personal in nature.

¶71 During the third encounter, C.A.S. may have been paying more attention to the situation than to P. However, the United States Supreme Court suggested in Biggers that a victim of a violent crime remembers more. Id. ("She was no casual observer, but rather the victim of one of the most personally humiliating of all crimes.").

¶72 The first two factors appear to question identifications where a witness briefly sees a stranger, perhaps out of a window, under poor conditions. C.A.S.'s identification presents on facts that are completely opposite. As the State put it, "the shooting itself was not the product of a brief, momentary encounter between two strangers."[10]

¶73 Law enforcement did not obtain a detailed prior description of P from C.A.S. before showing C.A.S. the Facebook

---

[10] Resp. br. at 30.

27

photo.  We note that the court of appeals "assume[d] for purposes of . . . [its] opinion only that the absence of a description weighs somewhat against reliability."  Roberson, No. 2017AP1894-CR, ¶38.  However, the State has the burden to prove that under the totality of the circumstances the identification is reliable, and under the Bigger's factors, collecting evidence prior to displaying the Facebook photo of Roberson was the State's responsibility.

¶74  The circuit court seemed to place a lot of weight on C.A.S. not knowing the difference between dreadlocks and cornrows when he described P.  However, there is no reason the jury cannot weigh this testimony as well as the circuit court.  Most evidence can be called into question in some way; however, that does not give the circuit court the ability to preclude admission.  We have cross-examination for a reason; evidence often is tested in that way.

¶75  The level of C.A.S.'s certainty favors reliability.  Immediately upon seeing the photograph, C.A.S. nodded his head up and down.  He did not wait for Reblin to ask him a question before indicating that the photo was P.  Then when he was asked if his identification was "100%," he said that it was.

¶76 Approximately two weeks passed between C.A.S.'s shooting and the identification.  We have no reason to conclude that two weeks is such a significant passage of time as to call into question the identification.  This is particularly true when we consider the amount of time the two spent together on three different days.

¶77 We further note that the identification was extremely well-documented in this case. It was videotaped in its entirety. If a picture is worth a thousand words, a video is a thousand pictures. The jury can watch the video, and it can hear and see C.A.S.'s comment and gestures in regard to his ability to identify African Americans. It can hear what C.A.S. said and see the accompanying hand gesture. The jury also can see the certainty on C.A.S.'s face when he is shown the Facebook photo.

¶78 Upon consideration of the totality of the circumstances bearing on the identification of Roberson, we conclude that there is not a substantial likelihood of misidentification by an unreliable identification. Therefore, the jury should decide whether Roberson was correctly identified as P.

¶79 Accordingly, we affirm the court of appeals and remand to the circuit court for proceedings consistent with this opinion.

### III. CONCLUSION

¶80 In conclusion, Roberson argued that the circuit court correctly granted his motion to suppress the identification evidence on the ground that the police utilized an unnecessarily suggestive procedure, which violated his due process rights under Article I, Section 8 of the Wisconsin Constitution as explained in Dubose.

¶81 The State urges us to overturn Dubose, and return to our past practice of following decisions of the United States

29

Supreme Court in regard to criteria that are necessary to accord due process in eyewitness identifications. We agree with the State. Dubose was unsound in principle. Therefore, we overturn Dubose and return to "reliability [a]s the linchpin in determining the admissibility of identification testimony." Brathwaite, 432 U.S. at 114; see also Biggers, 409 U.S. at 199. Due process does not require the suppression of evidence with sufficient "indicia of reliability." Perry, 565 U.S. at 232.

¶82 Accordingly, "a criminal defendant bears the initial burden of demonstrating that a showup was impermissibly suggestive." Wolverton, 193 Wis. 2d at 264 (citing Mosley, 102 Wis. 2d at 652 and Powell, 86 Wis. 2d at 65). If a defendant meets this burden, then the State must prove that "under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." Wolverton, 193 Wis. 2d at 264 (quoting Brathwaite, 432 U.S. at 106 and citing Biggers, 409 U.S. at 199). We conclude that the State has satisfied its burden here.

¶83 Therefore, we affirm the court of appeals and remand to the circuit court for proceedings consistent with this opinion.

*By the Court.*—The decision of the court of appeals is affirmed.

¶84 REBECCA GRASSL BRADLEY, J. *(concurring).* I join the majority opinion in full, except to the extent paragraphs 41-42 suggest that courts may consult social science research to interpret the Constitution. See Missouri v. Jenkins, 515 U.S. 70, 114, 119-20 (1995) (Thomas, J., concurring) (criticizing the majority for relying on "questionable social science research rather than constitutional principle" and noting that assumptions and social science research "cannot form the basis upon which we decide matters of constitutional principle"). Historically, when courts contaminate constitutional analysis with then-prevailing notions of what is "good" for society, the rights of the people otherwise guaranteed by the text of the Constitution may be trampled. Departures from constitutional text have oppressed people under all manner of pernicious pretexts:

> [T]he notion of "social harm" supporting the police power was completely untethered from constitutional text and ripe for misuse in the hands of a Justice such as Holmes, who believed that the Constitution could be reduced to ad hoc balancing. Eugenics was built upon the notion of harm; indeed, it thrived on a sense of imminent doom: that society was degenerating because of what were called its "weaklings" and "discards." The idea that society was being swamped by incompetents was a common trope for eugenicists: the unfit were a "menace." . . . Like the great popular eugenicists of the day, Holmes wrote in Buck that eugenics would prevent society from being "swamped" by incompetents, that fewer criminals would be executed, and that fewer imbeciles would starve.

Victoria Nourse, Buck v. Bell: A Constitutional Tragedy from a Lost World, 39 Pepp. L. Rev. 101, 114-15 (2011) (emphasis added; footnotes omitted).

1

¶85 In rebuking his colleagues for upholding segregation, Justice John Marshall Harlan rightly relied solely upon the Constitution:

> But in view of the constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens. There is no caste here. Our constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law. The humblest is the peer of the most powerful. The law regards man as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved.

Plessy v. Ferguson, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting).

¶86 Deplorable decisions such as Plessy v. Ferguson and Buck v. Bell[1] were rooted in evil concepts supported by social science and elitist mores antithetical to the Constitution. Ascertaining and faithfully applying the original meaning of the Constitution's words precludes appalling social science-based notions of the day from infecting constitutional analysis. Only the Constitution can serve as a reliable bulwark of the rights and liberty of the people. In order to emphasize that social science has no role to play in constitutional analysis, I respectfully concur.

¶87 I am authorized to state that Justice DANIEL KELLY joins this concurrence.

---

[1] 274 U.S. 200 (1927).

2

¶88 BRIAN HAGEDORN, J. *(concurring).* I join the majority opinion, but write separately to make three points.

¶89 First, while the dissent bemoans the policy outcome of today's decision, the practical effect need not be the full-throttled return of the showup evidence <u>Dubose</u> frowned upon. <u>State v. Dubose</u>, 2005 WI 126, 285 Wis. 2d 143, 699 N.W.2d 582. The majority is correct that courts should not allow social science to define new categories of constitutional protection divorced from the text of our constitution. That said, the latest social science research is a normal and welcome part of fact-finding, and can play a proper role in applying the facts to the law in these types of cases.

¶90 Going forward, I see nothing improper with circuit courts allowing vigorous cross-examination of showup evidence, or admitting expert testimony regarding the very social science research presented in this case. Law enforcement can continue to follow the same rules, and the legislature could choose to enact related policies into law. Nothing in the court's opinion today quibbles with best practices, police policies, and adversarial lawyering designed to ensure defendants have a fair shake.

¶91 It may be that the policy decision announced in <u>Dubose</u> is a good one. But that's not the legal question before us. The question here is whether our <u>constitution</u> requires the exclusion of this and similar types of evidence.

¶92 Second, one of the great civics failures of our time is the prevalence of the notion that everything that's bad is unconstitutional. Not so. Policy and law are and must be different if the judicial task is to mean anything. And the governing law when facing a constitutional question is not established by a public policy assessment or a social science research paper; it is established by the written constitution itself.

¶93 This case involves the constitutional right to due process of law. Wis. Const. art. I, § 8. Historically, "due process" meant having a basic process grounded in the pillars of notice and an opportunity to be heard. Thus, as a general matter, the original public meaning of "due process" was a guaranteed process, and did not encompass a broad swath of substantive rights. Modern attempts to constitutionalize every lamentable aspect of our criminal justice system by creating new substantive due process rights should be treated with immense skepticism. Courts and litigants are far too eager to address the latest social cause célèbre by turning the constitution's weathered parchment into a weapon of policy warfare.

¶94 As Justice Clarence Thomas has noted, the whole line of cases on eyewitness identification evidence "is premised on a 'substantive due process' right to 'fundamental fairness.'" Perry v. New Hampshire, 565 U.S. 228, 249 (2012) (Thomas, J., concurring). I agree with Justice Thomas that due process "is not a 'secret repository of substantive guarantees against "unfairness."'" Id. (quoted source omitted). When "fundamental

2

fairness" becomes synonymous with "unconstitutional," opportunities for judicial policy-making, and therefore judicial mischief, are plentiful.[1] Dubose is just one example. Instead of letting the crucible of cross-examination be the refining fire it has always been——and due process requires little more—— Dubose short-circuited the process and designed a new substantive right in the court's own image. Dubose was an effort to constitutionalize the policy choices of the court's majority without any real effort to ground those choices in the original public meaning of the constitutional text. Faithfulness to the law requires overturning Dubose.

¶95 Finally, it is with some irony that the dissent criticizes us for overruling Dubose. Fidelity to the principles of stare decisis, we are told, ensures "cases are grounded in the law, not in the will of individual members of the court." Dissent, ¶97. But as the majority notes, Dubose itself burned a decades-long line of precedent to the ground. We should surely be mindful and deferential toward precedent, but predictability

---

[1] Justice Hugo Black recognized this very threat in his dissent in Stovall v. Denno, 388 U.S. 293 (1967), the decision that gave rise to this entire line of due process jurisprudence. There, Justice Black described the Supreme Court's "concept of due process" as its own judgment of whether the totality of the circumstances of a particular case comport with its own conceptions of decency, fairness, and fundamental justice. Id. at 305 (Black, J., dissenting). The problem with this "constitutional formula," as Justice Black rightly explained, is that it substitutes the reviewing court's "judgment of what is right for what the Constitution declares shall be the supreme law of the land." Id. Put differently, the court becomes "not a Constitution-interpreter, but a day-to-day Constitution-maker." Id.

3

and stability are not served by clinging to the creative, atextual judicial inventions of yesteryear. It is _Dubose_ that departed from precedent. It is _Dubose_ that was the product of "the will of individual members of the court." _Dubose_ was an outlier and a reflection of judicial policy-making, not faithful constitutional interpretation. Today, the court rights the ship.

4

¶96 REBECCA FRANK DALLET, J. *(dissenting).* In Dubose, this court declared Wisconsin's approach to admission of showup evidence[1] upon a finding of reliability unsound and in violation of Article I, Section 8 of the Wisconsin Constitution.[2] State v. Dubose, 2005 WI 126, 285 Wis. 2d 143, 699 N.W.2d 582. Today, the majority departs from the doctrine of stare decisis and overrules Dubose, despite extensive research establishing the prevalence and danger of mistaken eyewitness identification. Ultimately the majority erodes the due process protection afforded by the Wisconsin Constitution and places jurors in the impossible position of separating the taint of a suggestive single photo identification from its reliability. For these reasons, I dissent.

A. The doctrine of stare decisis ensures cases are grounded in the law, not in the will of individual members of the court.

¶97 The doctrine of stare decisis ensures the integrity of the judicial system by developing consistency in legal principles and establishing that cases are grounded in the law,

---

[1] A showup is "an out-of-court pretrial identification procedure in which a suspect is presented singly to a witness for identification purposes." State v. Wolverton, 193 Wis. 2d 234, 263 n.21, 533 N.W.2d 167 (1995).

[2] Article I, Section 8 of the Wisconsin Constitution reads: "[n]o person may be held to answer for a criminal offense without due process of law, and no person for the same offense may be put twice in jeopardy of punishment, nor may be compelled in any criminal case to be a witness against himself or herself."

not in the will of individual members of the court. See Johnson Controls, Inc. v. Employers Ins. of Wausau, 2003 WI 108, ¶95, 264 Wis. 2d 60, 665 N.W.2d 257. "When existing law 'is open to revision in every case, deciding cases becomes a mere exercise of judicial will, with arbitrary and unpredictable results.'" Schultz v. Natwick, 2002 WI 125, ¶37, 257 Wis. 2d 19, 653 N.W.2d 266 (quoted source omitted). The outcome of a case should not turn on whether the current members of the court find one legal argument more persuasive but, rather, on "'whether today's [majority] has come forward with the type of extraordinary showing that this court has historically demanded before overruling one of its precedents.'" State v. Lynch, 2016 WI 66, ¶101, 371 Wis. 2d 1, 885 N.W.2d 89 (Abrahamson, J., concurring in part; dissenting in part) (quoting Payne v. Tennessee, 501 U.S. 808, 848 (1991) (Marshall, J., dissenting)).

¶98 The type of extraordinary showing this court relies upon to overturn precedent includes circumstances where:

> (1) Changes or developments in the law have undermined the rationale behind a decision; (2) there is a need to make a decision correspond to newly ascertained facts; (3) there is a showing that the precedent has become detrimental to coherence and consistency in the law; (4) the prior decision is "unsound in principle"; or (5) the prior decision is "unworkable in practice."

Bartholomew v. Wisconsin Patients Comp. Fund, 2006 WI 91, ¶33, 293 Wis. 2d 38, 717 N.W.2d 216 (quoted source omitted). The majority hangs its hat on the fourth circumstance and declares that Dubose is now "unsound in principle." Majority op., ¶¶3,

2

81.[3] To the contrary, I will show that <u>Dubose</u> remains sound in principle and that it is only the composition of this court that has changed.[4]

     B.   This court has afforded greater protection of citizens'
        liberties under the Wisconsin Constitution.

¶99 The majority claims that <u>Dubose</u> is unsound because it "misapplied" Article I, Section 8 of the Wisconsin Constitution in providing greater due process protection in the showup procedure than is mandated by the United States Supreme Court. Majority op., ¶51.[5] Yet, this court has historically refused to

---

[3] The majority opinion favorably cites to the arguments made in the dissenting opinions in <u>State v. Dubose</u>, 2005 WI 126, 285 Wis. 2d 143, 699 N.W.2d 582, signaling that a change in the composition of the court is the real reason <u>Dubose</u> has become unsound. <u>See, e.g.</u>, majority op., ¶¶55, 57: "As Justice Jon P. Wilcox explained"; "As Justice David T. Prosser cautioned."

[4] Justice Hagedorn's concurrence incorrectly claims that "<u>Dubose</u> itself burned a decades-long line of precedent to the ground." Justice Hagedorn's concurrence, ¶95. Instead, <u>Dubose</u> simply withdrew language from <u>Wolverton</u>, 193 Wis. 2d 234; <u>State v. Streich</u>, 87 Wis. 2d 209, 274 N.W.2d 635 (1979); and <u>State v. Kaelin</u>, 196 Wis. 2d 1, 538 N.W.2d 538 (Ct. App. 1995), that "might be interpreted as being based on the Wisconsin Constitution." <u>Dubose</u>, 285 Wis. 2d 143, ¶33 n.9. Moreover, post-<u>Dubose</u>, we have confirmed the "limited reach of [<u>Dubose</u>'s] actual holding" and recognized that it did not "create a precedential sea change . . . ." <u>State v. Luedtke</u>, 2015 WI 42, ¶¶49-50, 362 Wis. 2d 1, 863 N.W.2d 592.

[5] The majority also claims that <u>Dubose</u> is unsound because it "misunderstood United States Supreme Court decisions" by adopting standards "similar" to those in <u>Stovall v. Denno</u>, 388 U.S. 293 (1967). Majority op., ¶¶51-52. In <u>Stovall</u>, the United States Supreme Court upheld what it recognized as the "widely condemned" practice of show-ups because it was "imperative" that the police immediately conduct a showup for a dying eyewitness. <u>Stovall</u>, 388 U.S. at 302. This court's conclusion in <u>Dubose</u> that a showup is impermissibly suggestive absent necessity was
(continued)

3

be bound by the minimum protections set by the Supreme Court. "This court has demonstrated that it will not be bound by the minimums which are imposed by the Supreme Court . . . [if] the Constitution of Wisconsin and the laws of this state require that greater protection of citizens' liberties ought to be afforded." State v. Doe, 78 Wis. 2d 161, 172, 254 N.W.2d 210 (1977). Two significant examples described by the Doe court include: (1) granting the right to counsel at the state's expense one hundred years prior to the United States Supreme Court's pronouncement of this right in Gideon v. Wainwright, 372 U.S. 335 (1963); and (2) excluding evidence recovered through unlawful searches and seizures forty years before Mapp v. Ohio, 367 U.S. 643 (1961). See Carpenter v. Dane County, 9 Wis. 274 (1859); Hoyer v. State, 180 Wis. 407, 193 N.W. 89 (1923); see also State v. Hansford, 219 Wis. 2d 226, 580 N.W.2d 171 (1998) (holding that Article I, Section 7 of the Wisconsin Constitution guarantees a right to a 12-person jury in all criminal cases notwithstanding that the right to a 12-person jury in misdemeanor cases is not guaranteed by the United States Constitution).

¶100 This court has particularly described the rights defined in Article I, Section 8 as "so sacred, and the pressure so great towards their relaxation in case[s] where suspicion of guilt is strong and evidence obscure, that it is the duty of the courts to liberally construe the prohibition [against self-

appropriately guided by the "imperativeness" justification relied upon in Stovall.

4

incrimination] in favor of private rights." Thornton v. State, 117 Wis. 338, 341, 93 N.W. 1107 (1903). The Thornton court reminds us that courts must be vigilant "to refuse to permit those first and doubtful steps which may invade [Article I, Section 8] in any respect." Id. Just as in Thornton where we construed Article I, Section 8 to afford greater protection of a defendant's right against self-incrimination, in Dubose we applied the same constitutional provision to afford greater protection of a defendant's right to due process.

¶101 The majority opinion claims that because the wording of Article I, Section 8 of the Wisconsin Constitution is nearly identical to the Due Process Clause of the United States Constitution, the Wisconsin Constitution does not provide any additional protection. Majority op., ¶¶55-56. In Knapp, this court warned against this "lock-step" theory of interpreting the Wisconsin Constitution no broader than its federal counterpart:

> [w]hile textual similarity or identity is important when determining when to depart from federal constitutional jurisprudence, it cannot be conclusive, lest this court forfeit its power to interpret its own constitution to the federal judiciary. The people of this state shaped our constitution, and it is our solemn responsibility to interpret it.

State v. Knapp, 2005 WI 127, ¶60, 285 Wis. 2d 86, 700 N.W.2d 899; see also State v. Ward, 2000 WI 3, ¶59, 231 Wis. 2d 723, 604 N.W.2d 517 ("[I]t would be a sad irony for this court to . . . act as mere rubber stamps ourselves when interpreting our Wisconsin Constitution."). In now limiting a protection previously afforded under Article I, Section 8, the majority

5

ignores the warning from Knapp and shirks this court's solemn responsibility to interpret the Wisconsin Constitution.

C. Extensive social science research establishing the prevalence and danger of mistaken eyewitness identification is a proper consideration to support a shift in constitutional law.

¶102 The majority insinuates that the extensive social science research relied upon in Dubose is irrelevant and unreliable. The majority ignores the body of United States Supreme Court precedent that considered social science research in cases premised on constitutional interpretation and application. Social science research has formed the basis for the United States Supreme Court to overturn notable decisions including: criminalization of consensual same sex intimate conduct in Lawrence v. Texas, 539 U.S. 558 (2003), and imposition of the death penalty on the mentally ill and juveniles in Atkins v. Virginia, 536 U.S. 304 (2002), and Roper v. Simmons, 543 U.S. 551 (2005).

¶103 Additionally, the majority discounts the seminal case of Brown v. Board of Educ., 347 U.S. 483 (1954), where the United States Supreme Court held that "separate but equal" education of children of color, as the doctrine was mandated by Plessy v. Ferguson, 163 U.S. 537 (1896), violated the Constitution based upon comprehensive studies demonstrating the fallacy of that concept in practice. In Dubose, this court "follow[ed] the lead of Brown" and determined that current social science research demanded a "much-needed change to our jurisprudence" in the area of eyewitness identification. Dubose, 285 Wis. 2d 143, ¶44.

6

¶104 There is no support for the notion that the social science research relied upon in Dubose has become unreliable. There is no dispute that social science research establishes the prevalence and danger of mistaken eyewitness identification where inherently suggestive identification procedures like a showup are used. The lone study cited by the majority recognizes the danger of suggestive identification procedures and only reports an increase in the accuracy of identification when procedures include safeguards, like those imposed in the wake of Dubose. See majority op., ¶39 (citing John Wixted & Gary Wells, The Relationship Between Eyewitness Confidence and Identification Accuracy: A New Synthesis, 18 Psychol. Sci. in the Pub. Int. 10, 2017.[6]

¶105 Mistaken eyewitness identification is still the leading cause of wrongful convictions in the United States. According to the Innocence Project, sixty-nine percent of DNA exoneration cases in the United States involved convictions based on eyewitness misidentifications. See https: //www. innocenceproject.org/dna-exonerations-in-the-united states; see also Michael D. Cicchini, Joseph G. Easton, Reforming the Law on Show-Up Identifications, 100 J. Crim. L. & Criminology 381, 390 (2010) ("[o]ne study revealed that 'when the identification was

---

[6] The study evaluated the level of confidence in lineups done under "pristine conditions," which included the use of multiple fillers, double-blind testing, cautionary statements to eyewitnesses and a confidence statement made at the time of the lineup. John Wixted & Gary Wells, The Relationship Between Eyewitness Confidence and Identification Accuracy: A New Synthesis, 18 Psychol. Sci. in the Pub. Int. 12-17, 2017.

7

conducted twenty-four hours afterwards, fourteen percent of those who viewed a lineup made a mistaken identification, whereas fifty-three percent of those who viewed a show-up made a mistaken identification.'") The risk of mistaken eyewitness identification is even greater when the identification involves a suspect of a different race. See, e.g., Cunningham v. Peters, 941 F.2d 535, 541 (7th Cir. 1991) (Easterbrook, J. dissenting) ("All eyewitness testimony is problematic, given the frailties of human memory. Identification by members of other races is especially so.") (citing Sheri Lynn Johnson, Cross-Racial Identification Errors in Criminal Cases, 69 Cornell L. Rev. 934 (1984)). As was the case when Dubose was decided, current social science research establishes the frequency and danger of mistaken eyewitness identification and is therefore "impossible for us to ignore." Dubose, 285 Wis. 2d 143, ¶29.

> D. Dubose had a crucial impact in deterring the use of suggestive identification procedures and excluding inherently unreliable showup evidence.

¶106 The majority claims that overruling Dubose will have "minimal impact." Majority op., ¶65. The majority overlooks Dubose's influence on the implementation of statewide policies, exaggerates "negative treatment" of Dubose, and ignores the fact that many states have provided more due process protection for showup procedures post-Dubose. Most significantly, the majority fails to recognize the inherent unreliability of suggestive identification procedures like showups.

¶107 Dubose led to the implementation of statewide policies to reduce the frequency of mistaken eyewitness identifications

8

above and beyond the showup. Five months after Dubose was decided, the legislature enacted Wis. Stat. § 175.50, requiring law enforcement agencies to adopt model policies to minimize the possibility of mistaken eyewitness identifications. In formulating these policies, law enforcement agencies are to consider practices that "[t]o the extent feasible, show[] individuals or representations sequentially rather than simultaneously to an eyewitness" and "[m]inimiz[e] factors that influence an eyewitness to identify a suspect." §§ 175.50(5)(b) & (c). Accordingly, in 2010, the Wisconsin Department of Justice published its Model Policy and Procedures for Eyewitness Identifications recommending that law enforcement officials "conduct double-blind, sequential photo arrays and lineups with non-suspect fillers chosen to minimize suggestiveness, nonbiased instructions to eyewitnesses, and assessments of confidence immediately after identifications." Wis. Dep't of Justice, Model Policy and Procedure for Eyewitness Identification at 1 (Apr. 1, 2010). In adopting these policies, the Department of Justice recognized that suggestive law enforcement procedures could increase the likelihood of mistaken eyewitness identification, as this court emphasized in Dubose.

¶108 The majority claims that overruling Dubose will have little impact because it has "not created a substantial body of settled law" and because it "has been treated negatively by several subsequent Wisconsin appellate opinions." Majority op., ¶61. While it is true that subsequent decisions from this court have not extended Dubose's safeguards beyond that of a showup, a

9

decision not to extend Dubose is not equivalent to negative treatment. Just four years ago in Luedtke, we reaffirmed that "due process under the Wisconsin Constitution provides greater protection in one identification procedure, the showup." State v. Luedtke, 2015 WI 42, ¶50, 362 Wis. 2d 1, 863 N.W.2d 592. Moreover, there is no published Wisconsin appellate decision that treats Dubose negatively.

¶109 The majority attempts to paint Dubose as an anomaly and criticizes it for "explicitly rel[ying] on case law from Massachusetts and New York." Majority op., ¶58. Yet, the majority fails to discuss the increase in nationwide recognition of the danger of suggestive identification procedures post-Dubose. Seven states have significantly diverged from the federal doctrine, and in doing so have acknowledged the risk of suggestive identification procedures.[7] See J.P. Christian Milde,

---

[7] The majority disputes the extent to which earlier case law from two of these states has been overruled: State v. Ledbetter, 881 A.2d 290 (Conn. 2005) and State v. Herrera, 902 A.2d 177, 181 (N.J. 2006). See majority op., ¶61 n.8. Ledbetter was explicitly overruled by the Supreme Court of Connecticut in State v. Harris, 191 A.3d 119 (Conn. 2018). The Harris court concluded "we agree with the defendant that the Biggers framework is insufficiently protective of the defendant's due process rights under the state constitution. We therefore overrule our conclusion to the contrary in Ledbetter." Harris, 191 A.3d at 143 (emphasis added). Similarly, the New Jersey Supreme Court in State v. Henderson, 27 A.3d 872 (N.J. 2011), abandoned its previous application of the Brathwaite/Biggers reliability factors, in cases like Herrera, and provided more protection pursuant to the New Jersey constitution. See Henderson, 27 A.3d at 892 ("As we noted in Herrera, '[u]ntil we are convinced that a different approach is required after a proper record has been made in the trial court, we continue to follow the [Braithwaite] approach.' . . . That record is now before us.") In overruling Ledbetter and Herrera,
(continued)

10

Bare Necessity: Simplifying the Standard for Admitting Showup Identifications, 60 B.C. L. Rev. 1771, 1789-1806 (2019). Additionally, five states have adhered to the federal standard but have developed additions, modifications, or semantic distinctions providing additional protections. Id. at 1806-12.

¶110 Most importantly, the majority and concurring opinions overlook the inherent unreliability of identification evidence from showups and other suggestive procedures. The burden will now be placed on jurors to separate the taint of a suggestive identification procedure from the reliability of the identification. As this court in Dubose recognized, this is an impossible task: "[b]ecause a witness can be influenced by the suggestive procedure itself, a court cannot know exactly how reliable the identification would have been without the suggestiveness." Dubose, 285 Wis. 2d 143, ¶31. The suggestibility of an identification procedure can affect what a witness remembers and their confidence in that memory, rendering a subsequent reliability determination by a juror meaningless. See Elizabeth F. Loftus et al., Eyewitness Testimony: Civil and Criminal 69 (4th ed. 2007) ("[h]uman recollection can be supplemented, partly restructured, and even completely altered by postevent inputs."); see also Benjamin E. Rosenberg, Rethinking the Right to Due Process in Connection With Pretrial Identification Procedures: An Analysis and a Proposal, 79 Ky.

---

these states have followed Dubose's lead in providing more protection to defendants, as opposed to the standard that the majority reverts to today.

11

L.J. 259, 291 (1991) ("[A]n unnecessarily suggestive identification procedure simply creates unreliable evidence where reliable evidence could have been gathered.")

¶111 The adversarial process does not protect against the admission into evidence of mistaken eyewitness identification. "When an unconscious and innocent mistake causes the misidentification, cross-examination becomes a less useful tool because it only causes the witness to reassert confidence." Susan M. Campers, Time to Blow Up the Showup: Who Are Witnesses Really Identifying?, 48 Suffolk U. L. Rev. 845, 848-49 (2015). Further, "this exaggerated witness confidence produces a tendency in jurors to 'almost unquestionably accept eyewitness testimony." Id. at 849 (quoted source omitted). The majority and concurring opinions condone the return to inherently unreliable and suggestive identification procedures like the showup, and thus increase the risk of wrongful convictions caused by mistaken eyewitness identification.

> E. A defendant's right to due process is implicated when
> a single photo eyewitness identification procedure is not
> purely confirmatory.

¶112 Since I conclude that the foundation of Dubose is sound, I turn to the question presented in this case: under what conditions, if any, does a single photo identification procedure implicate a defendant's right to due process under Article I, Section 8? We have defined a showup as: "'an out-of-court pretrial identification procedure in which a suspect is presented singly to a witness for identification purposes.'"

12

Dubose, 285 Wis. 2d 143, ¶1 n.1 (quoting State v. Wolverton, 193 Wis. 2d 234, 263 n.21, 533 N.W.2d 167 (1995)). While not a one-on-one confrontation, a single photo identification procedure involving an unknown suspect presents the same risk of mistaken identification as a showup.[8] The Dubose court determined that a subsequent single photo identification procedure, showing the victim a mug shot of Dubose, "was also unnecessarily suggestive and that out-of-court identification should have been suppressed." Dubose, 285 Wis. 2d 143, ¶37. Whether an unknown suspect is presented singly to a witness in person or in a photograph, there is no material difference: law enforcement only suggests one suspect to the witness for identification. Therefore, the constitutional scrutiny this court applied in Dubose should also apply to a single photo identification that is not purely confirmatory.[9]

¶113 A purely confirmatory single photo identification does not carry with it the same risk of mistaken eyewitness identification as that of an unknown suspect, and therefore is not inherently suggestive. See State v. Greene, 201 A.3d 43, 52 (2019) ("[A] mere 'confirmatory identification' does not generate the myriad risks of misidentification that frequently

---

[8] Without any analysis, the majority declares "[w]e conclude that the State action that caused a showup to be subject to constitutional scrutiny in Dubose may be equally applicable to the use of a single Facebook photo for an out-of-court identification." Majority op., ¶48 (emphasis added).

[9] Dubose did not address the use of a showup procedure for a suspect that was known to the eyewitness.

13

attend a selective identification made under suggestive circumstances.") A purely confirmatory identification is used by law enforcement when a witness knows or is acquainted with a suspect but cannot identify that person by name. See, e.g., National Research Council of the National Academies, Identifying the Culprit: Assessing Eyewitness Identification 22, 28 (2014) ("Police typically limit [displaying a single photograph] to situations in which the perpetrator is previously known to or acquainted with the witness."); Sides v. Senkowski, 281 F.Supp.2d 649, 654 (W.D.N.Y. 2003) (describing an identification as merely confirmatory when the "parties knew each other previously"). Due to the relationship or familiarity between the people involved, a purely confirmatory identification procedure minimizes the risk that law enforcement's suggestion of a single suspect would lead to a mistaken eyewitness identification.

¶114 Accordingly, I would remand the case for an evidentiary hearing to determine whether C.A.S.'s identification of Roberson was purely confirmatory. If the identification was not purely confirmatory, it was suggestive and the State must prove the necessity of the procedure, just as in Dubose.

¶115 For the foregoing reasons, I respectfully dissent.

¶116 I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.

14